Gary L. **WEBB, et al., Plaintiffs–Appellants,**

v.

**BOARD OF TRUSTEES OF BALL STATE UNIVERSITY, et al., Defendants–Appellees.**

No. 98–1317.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1998.

Decided Feb. 5, 1999.

Rehearing and Rehearing En Banc Denied March 9, 1999.

---

L. Anita Richardson (argued), Office of the Corporation Counsel, Chicago, IL, Jona Goldschmidt, Chicago, IL, for Plaintiffs–Appellants.

Scott E. Shockley (argued), Defur, Voran, Hanley, Radcliff & Reed, Muncie, IN, for Defendants–Appellees.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Criminal Justice and Criminology Department of Ball State University has suffered a collapse of cooperation and decorum. Adversaries in this case agree about the symptoms but not about the causes and cure. Gary L. Webb, a tenured professor and between 1991 and 1997 chair of the department; Susan L. Sayles, an untenured professor who has supported Webb in the internecine warfare; and Melissa L. Wisner, an administrative aide to Webb who was transferred within the University when Webb lost his position

as the department's head, are the plaintiffs. They contend in this action under 42 U.S.C. § 1983 that the University retaliated against them for protected speech.

Webb believes that officials of the University's administration have had it in for him ever since 1991, when he engineered the removal of four members of the department. Hostility turned to warfare in 1994, when Webb filed a complaint accusing another member of the department of sexually harassing a student. Wynola Richards, the Assistant Provost with jurisdiction over such matters, had been dating Webb, but their relationship had ended. When Richards recommended a reprimand rather than immediate discharge of the faculty member in question, Webb accused Richards (and other members of the central administration, such as Ronald Johnstone, Dean of the College of Sciences and Humanities and thus Webb's immediate superior, and John E. Worthen, President of the University) of ethical lapses for not taking stronger action. During the ensuing months Webb filed multiple charges with the University's disciplinary machinery, and other members of the department—some of them objects of Webb's charges—responded by accusing Webb himself of improprieties, after which Webb charged his accusers with misconduct of their own. Dissatisfied with the outcome of the initial waves of complaints, Webb wrote and presented to the President and the Board of Trustees a 225–page broadside laying blame on almost everyone but himself.

By this time Richards and at least two members of the department had quit. President Worthen appointed a committee of faculty members who had stood apart from the *contretemps*. After listening to presentations from the combatants, the committee decided that the antagonism could be resolved only by making personnel changes. Meanwhile, Webb and Sayles had begun filing charges with the EEOC. None led to a finding favorable to plaintiffs, but they believe that what happened next is retaliation for these filings.

In 1996 the faculty of the Criminology Department notified the administration that Webb had lost its support and should be replaced as chair by professor James Hendricks when Webb's term ended on July 1, 1997. About the same time Sayles came up for tenure and was passed over. President Worthen appointed Hendricks as the new chair, and Dean Johnstone directed Webb to cooperate with Hendricks in the transition. Instead of assisting Hendricks, Webb filed two suits in an Indiana court asking the judge to resolve a dispute about teaching assignments. Both suits were resolved in the University's favor by late February 1997. Webb's failure to facilitate the transition to Hendricks led President Worthen to authorize Hendricks to take over in March 1997; it was impossible to manage the Criminology Department with its own chair in litigation against the University.

Hendricks' elevation created a new problem, because Wisner, the department's "administrative coordinator," had filed multiple charges accusing Hendricks of improprieties. Norman Beck, the University's Director of Human Resources, transferred Wisner to a position in the College of Architecture and Planning, without loss of pay or prestige.

As the department's new chief, Hendricks issued a teaching schedule for 1998. Webb and Sayles objected to their assignments. That for Sayles is no longer in issue; in fall 1997 her therapist certified that she is clinically depressed and unable to teach. Webb believes that his assignment is retaliatory, and he has asked the district court in this litigation to require the University to let him teach classes that he deems appropriate to his fields of specialization. Webb's list of other supposedly unconstitutional acts is long: to quote from his brief, "Hendricks kept Webb's telephone number after Webb vacated the chairperson's office so that he would get all of Webb's telephone calls; ... conducted meetings, elections, and other Department business in violation of 1992 Department policy that adopted Robert's Rules of Order; [and] formed committees without any tenured faculty except for himself" (citations to the record omitted), among many other sins.

Plaintiffs sought a preliminary injunction that would rejuggle the teaching schedules for the spring 1998 semester, move Wisner

from the Architecture Department back to the Criminology Department (or another position that she finds "compatible"); and direct defendants to desist from any retaliation against or harassment of the plaintiffs. At plaintiffs' request, the district judge held a six-day evidentiary hearing during the Christmas season and made an expedited decision. In oral findings read from the bench on January 6, 1998, the district judge concluded that some of plaintiffs' speech likely is protected by the Constitution, but that the dispute is so complex and has become so personal that much of the speech and conduct is not protected. Compare *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), with *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The judge thought it impossible to sort out which was which on such short notice without the aid of plaintiffs—who have steadfastly insisted that it is the court's job, not theirs, to identify which aspects of the rumpus have constitutional implications—and added that it was not necessary to do so, because the dispute had gone well past the exchange of ideas and entered the realm of disruptiveness, which entitles an employer to act in order to promote its mission even when the speech is constitutionally protected. *Waters v. Churchill*, 511 U.S. 661, 671–75, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion), *id.* at 684–85, 114 S.Ct. 1878 (Souter, J., concurring). The judge added that he thought that plaintiffs also had failed to establish irreparable injury.

■ The district judge informed the parties that he was working on written findings and conclusions that would supplement the oral statement, and that he expected to complete the work by March 1, 1998. But plaintiffs asked him to stay all proceedings, including release of the opinion, while they appealed. As a result the appeal has proceeded without the benefit of a written opinion. Many of the arguments plaintiffs make are untenable as a result. Repeatedly plaintiffs complain that the judge did not go into enough detail, especially concerning the finding of disruptive behavior. Where are the findings of fact to back this up?, plaintiffs inquire. The answer is that the findings are in the judge's computer and would have been

released almost a year ago, except for plaintiffs' impatience to appeal. Perhaps they thought the oral findings more vulnerable than a written opinion would have been. But a judge is to be commended, not reversed, for accommodating a request for expedition and giving a summary oral explanation, with written findings to follow. Plaintiffs have only themselves to blame for the state of the findings; we shall proceed accordingly.

■ Several of the requests plaintiffs make (or imply) are not appropriate at this preliminary stage. We explained why in *Hetreed v. Allstate Insurance Co.*, 135 F.3d 1155, 1158 (7th Cir.1998): giving a plaintiff a particular job while the litigation continues has potentially high costs for the employer if the plaintiff eventually loses, for in the interim the employer will have lost control of the workplace and may disburse salary that cannot be recouped; but waiting until the end of the case has low costs for the employee, because back pay and damages are available to compensate for any loss while the case proceeds. See also, e.g., *Sampson v. Murray*, 415 U.S. 61, 89–92, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). The district judge therefore did not abuse his discretion in concluding that plaintiffs are not irreparably injured by deferring final decision about most of the relief they request.

■ Still, teaching one class rather than another has no obvious monetary equivalent, and the loss of teaching or scholarly experience in a particular field between now and the final decision may have effects on a scholarly career that are impossible to quantify. Likewise, ongoing harassment or retaliation could amount to irreparable injury. But to identify an irreparable injury is not to say that relief is in order. An injunction restoring Webb to certain classes imposes costs on other scholars—and on the University, whose ability to set a curriculum is as much an element of academic freedom as any scholar's right to express a point of view. Concurring in *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), Justices Frankfurter and Harlan referred to the four freedoms *of a university*: "to determine for itself on academic grounds who may

teach, what may be taught, how it shall be taught, and who may be admitted to study." Cf. *Webster v. New Lenox School District No. 122*, 917 F.2d 1004 (7th Cir.1990); Stephen R. Goldstein, *The Asserted Constitutional Right of Public School Teachers to Determine What They Teach*, 124 U.Pa. L.Rev. 1293 (1976). A university's academic freedoms are qualified by the need to respect faculty members' civil rights—no university could have a policy of closing leadership positions to blacks or women, for example—but when deciding who to appoint as a leader or teacher of a particular class, every university considers speech (that's what teaching and scholarship consists in) without violating the Constitution. See *Feldman v. Bahn*, 12 F.3d 730 (7th Cir.1993); *Jeffries v. Harleston*, 52 F.3d 9 (2d Cir.1995). We need not attempt to determine when a court may interfere with a university's curriculum or choice of department heads; it is enough to say that the issues raised by a request for such relief are reason enough to withhold it at an early stage of a suit.

■ There is, moreover, an independent difficulty with plaintiffs' demand for immediate relief: is the University's ongoing conduct "harassment" or "retaliation," as plaintiffs insist, or is it the University's legitimate effort to make the best of a bad situation? One reason the University's actions might be deemed proper is that many (perhaps most) of plaintiffs' statements appear to be personal in nature, and therefore outside the first amendment. Although the immediate impetus for the current dispute—Webb's complaint that another faculty member made inappropriate sexual requests of a student—readily could be characterized as "speech on a matter of public concern", *Connick*, 461 U.S. at 146, 103 S.Ct. 1684; *Rankin v. McPherson*, 483 U.S. 378, 384–87, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the dispute quickly became one about the power of the department's head (could he get rid of the other faculty member despite the action of the Assistant Provost?) and developed into a brouhaha about allocation of power within the University. That is potentially personal; and Webb at least took it personally. Plaintiffs blame the district court for failing to disentangle the public and private aspects of the speech, but we conclude that the court did not need to do so—for on this record the conclusion that plaintiffs became disruptive cannot be called a clear error or abuse of discretion.

■ Universities are entitled to insist that members of the faculty (and their administrative aides) devote their energies to promoting goals such as research and teaching. When the bulk of a professor's time goes over to fraternal warfare, students and the scholarly community alike suffer, and the university may intervene to restore decorum and ease tensions. Webb wrote and presented to the Board of Trustees a book-length manuscript devoted to his grievances, but there is no evidence that during 1994–97 Webb produced any scholarly work. Webb's department melted down while he was at the helm; charges, countercharges, and litigation replaced education. How could any university recruit new faculty to the Criminology Department under these circumstances, or retain the best members of the existing faculty? The record also contains reports of considerable student dissatisfaction with the quality of the instruction during these years. Time that senior officials of the University (the Board, the President, the Provost) could have devoted to scholarly improvement or fundraising has been diverted to efforts to placate enraged faculty members and ameliorate the ensuing problems. Under the circumstances, the University's right as employer to achieve the organization's goals must prevail:

> The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters*, 511 U.S. at 675, 114 S.Ct. 1878 (plurality opinion). We do not rule out the possibility that on a more complete record plaintiffs may be able to show that scholarship

and teaching proceeded at a normal pace while the intramural dispute festered, but as things stand the denial of injunctive relief must be

AFFIRMED.