# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-4034

SECOND CITY MUSIC, INC., doing business as
Second Hand Tunes,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, Illinois,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 7741—**David H. Coar**, *Judge.*

ARGUED FEBRUARY 11, 2003—DECIDED JUNE 27, 2003

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit
Judges.*

EASTERBROOK, *Circuit Judge.* To prevent dealers in used
merchandise from serving (wittingly or not) as fences
for thieves, Chicago requires them to obtain licenses, col-
lect information about each person from whom they pur-
chase goods, and submit to searches on demand. Chicago
Municipal Code §§ 4-264-005 to -230. The ordinance cov-
ers all dealers in "secondhand property," a term that means
any used "audio-video equipment, camera, computer hard-
ware, jewelry made of precious metal or stone, article
made of precious metal, precious stone or gem, sporting
or athletic wear or equipment, including a bicycle, watch

or currency." Chicago Municipal Code §4-264-005 ¶7. The phrase "audio-video equipment" has its own definition (*id.* at ¶1): "any stereo, speaker, radio, video recorder, video camera, television, tape or disc player, telephone, pager or satellite signal device." That was the definition, at any rate, until June 2002, when the City added two items that it concluded had become popular with thieves: compact discs (CDs) and digital versatile discs (DVDs). Second Hand Tunes believes that by doing this Chicago violated the first and fourth amendments, plus the due process clause of the fourteenth. Until the amendment, Second Hand Tunes had not needed a license to operate its business of buying and selling used recordings, and it had not needed to keep the records required by the law; it asked the district judge to prevent the City from applying the amendment to established businesses. After the district court denied its motion for a preliminary injunction, see 231 F. Supp. 2d 784 (N.D. Ill. 2002), Second Hand Tunes took an immediate appeal, which we expedited. The arguments on appeal are a subset of those presented to the district court; we describe only those developed in this court.

Second Hand Tunes first contends that §4-264-020 is unconstitutionally vague, at least as applied to dealers in materials protected as speech under the first amendment. This section provides, among other things, that an applicant for a license to deal in used goods must be "of good character and repute." According to Second Hand Tunes, the imprecision of this language enables the City to discriminate against dealers in songs and movies that the police find irksome—for example, gangsta rap, songs with lyrics extolling drug use or underage sex, and lurid movies that approach but do not cross the border into obscenity. Relying principally on *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), Second Hand Tunes contends that an open-ended licensing standard operates

as a prior restraint on speech. The district court concluded, however, that the ordinance does not regulate speech, so that the special rules applicable to that topic do not apply. Instead, the court thought, it is a generally applicable law, covering rare coin dealers, bicycle shops, and only incidentally sellers of used audio and video discs. This led the judge to apply the approach of *Graff v. Chicago*, 9 F.3d 1309 (7th Cir. 1993) (en banc), which holds that municipalities need not write generally applicable laws with the same precision required of laws that address speech.

Second Hand Tunes' other target is §4-264-050(f), which requires dealers to make their records available to the police for inspection on demand during business hours. The record-keeping rules are themselves extensive: dealers must learn (and document) the identity of those from whom they buy, must log every item purchased in each transaction, and must deliver this information to the police daily; then dealers must hold new inventory unsold for 10 days, so that the police may retrieve any items that had been stolen. In the district court Second Hand Tunes directly challenged the record-keeping rules; on appeal these rules are relevant only to the extent that they ensure that, if police arrive for an inspection, there will be plenty to see. The district court held that the obligation to admit the police for inspection does not violate the fourth amendment because it is reasonable in time (being limited to business hours, when anyone may walk in off the street and peruse the inventory) and scope (being limited to records that facilitate identification of stolen goods). The district judge observed that sellers of used merchandise long have been closely regulated to separate legitimate dealers from fences, and that decisions such as *New York v. Burger*, 482 U.S. 691 (1987), deem "reasonable" searches of business premises designed to ensure compliance with regulatory require-

ments. Cf. *Dimeo v. Griffin*, 943 F.2d 679 (7th Cir. 1991) (en banc). This aspect of the district court's decision seems to us correct, for the reasons the district judge gave. If the City should implement these provisions in an unconstitutional manner (for example, by increasing the frequency of inspections of shops that carry disfavored recording), then both money damages and injunctive relief will be available. If applied as written, though, they comport with the Constitution.

Vagueness in the licensing requirement is, however, a more difficult issue. *Weinberg v. Chicago*, 310 F.3d 1029, 1043-46 (7th Cir. 2002), holds that precision is required with respect to a law's application to speech even if that law principally covers matters other than speech. Yet neither is this case a replay of *Weinberg*, where the plaintiff had a particular viewpoint that he wished to communicate, or of *Lakewood*, where the ordinance was directed to newsracks. Second Hand Tunes is not itself a speaker but facilitates a market where speech is a product on sale. Plaintiff concedes that it has no point of view with respect to the works of authors, either; it buys and sells whatever comes on the market.

An effort to control where and how middlemen sell the written word differs in principle from a law addressed only to middlemen—such as, for example, a statute requiring all retail outlets, including bookstores, to be "clean" and "well lit". These are vague terms, to be sure, but unlikely to have either the purpose or the effect of stifling speech, as a law that reads directly on the sale of books or newspapers could do. Intermediaries and agents often are subject to rules that could not be applied to primary speakers. Think of the requirements for admission to the bar. Lawyers must demonstrate character and fitness under standards that are no clearer than those Chicago applies to dealers in used merchandise, cf. *In re Anastaplo*, 366 U.S. 82 (1961), and lawyers may be disci-

plined if they engage in "conduct unbecoming a member of the court's bar". See Fed. R. App. P. 46(b)(1)(B). No such rules could be applied to authors and publishers, but as applied to those who *represent* authors and publishers they are valid. See *In re Mann*, 311 F.3d 788 (7th Cir. 2002). Second Hand Tunes concedes as much; it does not contend that licensing is invalid *per se* (as licensing of newspapers would be) but only that Chicago's licensing scheme could be misused.

Regulating who may be a middleman in the resale of music and video discs for which the authors and publishers already have been paid could affect speech in only an indirect way, and no author has argued (either as a party of by appearance as *amicus curiae*) that Chicago's system would hamper its speech. Doubtless a healthy second-hand market makes people more willing to buy (or to pay extra for) new goods. See Michael Waldman, *Eliminating the Market for Secondhand Goods*, 40 J.L. & Econ. 61 (1997); cf. R.H. Coase, *Durability and Monopoly*, 15 J.L. & Econ. 143 (1972). Still, a small increase in the cost of operating a resale market is unlikely to have a significant effect on the primary market—and plaintiff has not endeavored to show that the costs created by the amended ordinance would be other than small, in relation to the existing costs of operating this second-hand market. Nor has plaintiff introduced evidence showing a significant viewpoint-related effect on the second-hand market itself (a possibility we consider further below).

What is more, Chicago's licensing rule is not product specific. That is to say, anyone holding a license to operate a used-goods dealership in Chicago may sell *any* second-hand merchandise, which makes it even harder to clamp down on a particular kind of merchandise. Police examining a license application have no idea what the dealer may decide to stock in the future. This differs from the ordinances in *Lakewood* and *Weinberg*, where

at the time of enforcement officials knew exactly what speech was at issue and could target disfavored expression.

Because the ordinance as written does not target speakers, and Second Hand Tunes does not contend that it has a point of view that the City is attempting to silence or disfavor, potential uncertainty about the scope of the good-character requirement does not automatically invalidate the law, see *Virginia v. Hicks*, No. 02-371 (U.S. June 16, 2003), though it may provide ground for further development. It is possible to test plaintiff's prediction that the ordinance induces dealers in used CDs and DVDs to shy away from controversial recordings. The parties can investigate whether dealers' mix of inventory has changed. It should be easy to determine whether dealers that carry (or carried) recordings offensive to the police have had their license applications turned down, experienced an unusually high number of inspections, and so on. Proof that the system in practice is being used to increase the costs of some dealers relative to others, in a way that shrinks the market for disfavored recordings, would support relief for dealers adversely affected.

There is, however, no strong justification for immediate relief to *this* plaintiff, for Second Hand Tunes does not contend that it has altered or is inclined to alter its own mix of inventory. It made but then withdrew an application for a license. Unlike persons with religious objections to licensing, see *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150 (2002), Second Hand Tunes would incur no detriment by the act of applying. The record does not afford any reason to suppose that it would be turned down, if it carried through with an application. Thus the "good character and repute" clause in the licensing section does not cause plaintiff irreparable injury, without which there is no basis for preliminary injunctive relief. See *Sampson v. Murray*, 415 U.S. 61, 84-92 (1974). Injury, if

any, comes from the expense of complying with the record-keeping requirements, but plaintiff has not pressed in this court any argument that they violate the first amendment. As we have said, some real injury may lurk beneath the surface if the ordinance is *implemented* in a way that raises the relative costs of dealers in controversial recordings, but evaluating this possibility requires evidence so far missing from the record.

Second Hand Tunes contends that it does suffer irreparable injury because, without the aid of an injunction, it will go out of business. Yet *two* things could keep it in business; an injunction or a license. If the license can be had, then the lack of an injunction does not lead to irreparable harm. Injury caused by failure to secure a readily available license is self-inflicted, and self-inflicted wounds are not irreparable injury. Only the injury inflicted by one's adversary counts for this purpose. The Supreme Court held in *Lakewood* that the newspaper did not need to apply for a license, because licensing the press is one of the principal evils against which the first amendment is directed. See 486 U.S. at 755-56. Second-hand dealers differ from the press; plaintiff concedes that it lawfully may be required to obtain a license, provided that the terms on which licenses issue curtail administrative discretion. Chicago insists that in practice no discretion is being exercised, and since Second Hand Tunes does not say that its owners are felons it can have a license for the asking (plus the fee, which is not separately objectionable).

The sensible way to proceed is for Second Hand Tunes to obtain a license and continue to operate while it builds a record. After discovery has been completed, the district judge can determine whether the licensing officials exercise discretion or instead apply a mechanical rule, and whether either the licensing standards or the implementation of the record-keeping rules has affected the

availability of controversial recordings. Any injury that Second Hand Tunes incurs by following a different course is of its own choosing. The order of the district court denying its request for interlocutory relief therefore is

AFFIRMED.

A true Copy:

  Teste:


_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*