# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3018

JAMES CAMPBELL,

*Plaintiff-Appellant,*

v.

FRANK MILLER, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 01:03-CV-0180-SEB-VSS—**Sarah Evans Barker**, *Judge.*

———————

ARGUED FEBRUARY 11, 2004—DECIDED JUNE 28, 2004

———————


Before EASTERBROOK, KANNE, and WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Police in Indianapolis arrested James Campbell for possessing marijuana. Because the local jail is crowded, Indianapolis does not make a full custodial arrest of each person arrested for a misdemeanor; instead it issues a summons and citation. Before releasing Campbell, however, the police conducted a body-cavity search for drugs. Nothing was found, and no criminal prosecution ensued. Campbell then sued ten officers, the Chief of Police, and the City of Indianapolis, under 42 U.S.C. §1983, contending that the search violated the fourth amendment. He seeks not only damages but also

an injunction against this practice. The district court denied Campbell's request for a preliminary injunction, concluding that he has an adequate remedy at law. He immediately appealed under 28 U.S.C. §1292(a)(1).

Campbell supposes that money never is an adequate remedy for a constitutional wrong. That belief is incorrect. See *Sampson v. Murray*, 415 U.S. 61, 89-92 (1974); *Second City Music, Inc. v. Chicago*, 333 F.3d 846 (7th Cir. 2003); *Webb v. Ball State University*, 167 F.3d 1146 (7th Cir. 1999). Damages are a normal, and adequate, response to an improper search or seizure, which as a constitutional tort often is analogized to (other) personal-injury litigation. See, e.g., *Wilson v. Garcia*, 471 U.S. 261 (1985). Erroneous grants of injunctive relief that hamper enforcement of the criminal law have the potential to cause havoc, while erroneous awards (or denials) of damages to a single person have more limited ability to injure the general public. Judges are fallible, so the costs of false positives always must be considered when choosing among remedies. When the costs of false negatives are low—and this is what it means to say that the remedy at law is adequate—there is correspondingly slight reason to incur the risk of premature or overbroad injunctive relief. Campbell's suit is just getting under way, and the City has not had a full opportunity to explain and justify its practices. Once this litigation has run its course, the decision will have precedential effect even if the only remedy is monetary. If this court decides that the City's practice is unconstitutional then it must cease whether or not a formal injunction issues (for the prospect of damages paid to thousands of suspects would bring the City into line). If, however, the City prevails in the end, or suffers only a partial defeat, then avoiding premature injunctive relief will prove to have been a wise exercise of restraint.

What is more, it is difficult to see how a court *could* issue an injunction at Campbell's behest. Unless the same events

are likely to happen again *to him* there is no controversy between him and the City about the City's future handling of other arrests. See *Weinstein v. Bradford*, 423 U.S. 147 (1975). Campbell has sought to represent all persons arrested for misdemeanors, but the district court has not certified that class and may never do so. Thus Campbell cannot rely on the prospect that other arrested persons may be subjected to body-cavity searches. Cf. *Los Angeles v. Lyons*, 461 U.S. 95 (1983). He represents his own interests, not those of third parties. Only if *he* is apt to be arrested and searched again would prospective relief be apt, and nothing in this record suggests that Campbell is a repeat offender. He alleges, to the contrary, that he does not use drugs and has never been arrested before. These allegations mean that he is not the right party to pursue injunctive relief.

AFFIRMED

WILLIAMS, *Circuit Judge*, dissenting.     The majority opinion fails to address key testimony in this case—factual allegations which not only require this court to evaluate Campbell's claim in more detail than the majority opinion provides, but also suggest a different result. While I regard the question of whether Campbell has standing for a preliminary injunction as close, I ultimately conclude that he has satisfied that constitutional requirement and has also demonstrated the inadequacy of money damages. For these reasons, I dissent.

## I.  Additional Background[1]

[1] Because the district court made limited findings of fact, my summary is taken from testimony presented in the preliminary injunction hearing and the parties' briefs. While the factual allegations discussed in the body of my dissent are those that are most germane to this case's analysis, I offer this brief summary to put Campbell's encounter with the police in context:

Campbell, employed as the School Transportation and Security Supervisor for Perry Township, testified that on June 14, 2002 at about 8 p.m., he parked his car and began walking towards the house of his friend, Kimo Parham, an insurance product analyst. According to defendant Officer Frank Miller, it was still light outside. Officer Miller recounted that he saw Campbell walking towards Parham's home and told Campbell to stop. Unsure of the officer's motives, Campbell stated that he continued to walk towards Parham's residence, hoping to get close enough so that, in Campbell's words, "somebody inside would hear what was going on and come outside to observe what was going on." Officer Miller testified that he then drew his weapon, told Campbell to drop to the ground, and then handcuffed him. Parham, who testified that he was expecting Campbell, stated that he saw Campbell being handcuffed, asked what was happening, and heard Officer Miller comment that Campbell fit the description of a fleeing suspect. Campbell testified that once Officer Miller said that the suspect fled on foot, he asked Officer Miller whether he had seen Campbell exit his car in front of Parham's house. Campbell and Parham testified that there was no mention of drugs made at that time.

Shortly thereafter, defendants Officers Andrew Lamle and Scott Wolfe arrived. Officer Miller conducted a pat-down search of Campbell and found nothing. Officer Miller told Wolfe that Campbell had dropped something by a car in the driveway (although Campbell disputes that he dropped anything). Wolfe then picked up a plastic baggie containing marijuana from the ground. Defendant Officer Kevin Duley, the officer who had been pursuing the fleeing suspect, testified that about ten minutes after the pat-down, he arrived and stated that he did not want to arrest Campbell because he had not seen the face of the suspect who fled from him.

(continued...)

The majority correctly notes that Indianapolis police officers subjected Campbell to a body cavity search; however, the majority does not mention that the police conducted their inspection of Campbell's genitalia and anal area *in public*, namely in the backyard, allegedly visible from the driveway of the home of Campbell's friend, Kimo Parham, and within eye-shot of Parham (who observed the search) and his young children. In fact, Parham testified that he observed the search from a window of his home and actually saw Campbell's genitals exposed.

Not only was the body cavity search done in public, but it was done pursuant to Indianapolis Police Department ("IPD") policy.[2] This policy authorizes such "thorough body

_____

(...continued)

Campbell contends that Officer Miller then told Campbell that due to jail overcrowding, he had to strip search him at that time to determine if he had drugs on him. Campbell testified that while in Parham's backyard and while still handcuffed, Officer Miller (donning latex gloves) unbuckled Campbell's pants and pulled down his underpants, exposing his genitalia, had him bend over slightly, and examined his buttocks and anal area. Campbell also testified that Officer Miller felt under Campbell's groin area. Officer Miller contends that he only spread Campbell's buttocks. Nothing was found as a result of the search. Officer Miller testified he then pulled up Campbell's pants, gave him a summons to appear for possession of marijuana, and released him. Campbell testified no charges were ever filed.

[2]  While the district court made no findings of fact as to whether defendants conduct public strip and body cavity searches pursuant to a blanket police policy, both parties point to, and the district court noted, the provisions of the Executive Committee of the Marion County Superior Court Order of April 18, 2002 and the IPD General Order 18.02 as authorizing such public searches.

The Executive Committee of the Marion County Superior Court Order of April 18, 2002 states "It is therefore the Order of the
(continued...)

searches" of persons charged with nonviolent misdemeanors including driving without a license and driving with a suspended license. *See* sources cited *supra* note 2. Moreover, Indianapolis Police Chief Jerry Barker's testimony indicates that IPD officers are provided with little guidance on and wide discretion to conduct "thorough body search[es]" under this policy. In Chief Barker's words, application of the policy is dependent on "[r]easonableness and discretion of the officer, based on the totality of the circumstances and [sic] officer faces," or, as stated in the defendants' brief, "if the officer feels it is necessary."

---

[2] (...continued)
Marion Superior Court, by and through its Executive Committee that

    A.    The Marion County Sheriff no longer accept arrestees into the Marion county Lock-up who are only charged with the following misdemeanor crimes:

        1.)  Possession of Marijuana

        2.)  Possession of Paraphernalia

        3.)  Driving with a suspended license

        4.)  Operating a vehicle; never having received a license

        5.)  Prostitution

        6.)  Patronizing a prostitute

        7.)  Conversion

   . . . .

    C.    The Marion County Sheriff advise all Law Enforcement agencies within Marion County to issue summons in lieu of arrest for the above referenced crimes if charges are to be filed with the Marion County Prosecutors' Office."

IPD General Order 18.02 provides, in pertinent part, "Any officer making an arrest or otherwise coming into control of a prisoner must make an immediate and *thorough body search* of the prisoner. . . ." (emphasis added).

## II. Inadequacy of Money Damages

The existence of these factual allegations, absent from the majority opinion, compels a closer look at Campbell's claims and, in the end, different legal conclusions than those drawn by the majority. Several courts have recognized that, at the very minimum, strip and body cavity searches "give[ ] us the most pause," *Bell v. Wolfish*, 441 U.S. 520, 558 (1979), as the invasive searches "implicate fundamental Fourth Amendment rights," *Roe v. Texas Dep't of Protective and Regulatory Services*, 299 F.3d 395, 404 (5th Cir. 2002). As the Supreme Court noted in *Illinois v. Lafayette*, 462 U.S. 640, 645 (1983) in its discussion of lawful inventory searches incident to booking and jailing,

> Police conduct that would be impractical or un-reasonable—or embarrassingly intrusive—on the street can more readily—and privately—be per-formed at the station. For example, the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him, although that step would be rare.

Moreover, this court has characterized strip and body cavity searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repul-sive, signifying degradation and submission . . . ." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (quoting *Tinetti v. Wittke*, 479 F. Supp. 486, 491 (E.D. Wis. 1979), *aff'd*, 620 F.2d 160 (7th Cir. 1980)). Finally, this court has stated that "we can think of few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here." *Mary Beth G.*, 723 F.2d at 1272 (finding unconstitutional searches of women briefly de-tained for misdemeanor offenses, including driving without

a driver's license, in city lockup while awaiting bail money). So at the very least, Campbell's case warrants a closer look.

Close consideration of the case at hand also compels different legal conclusions. Reviewing the district court's legal conclusions in its preliminary injunction ruling de novo, as we must, *Kiel v. City of Kenosha*, 236 F.3d 814, 815 (7th Cir. 2000), this court may properly conclude Campbell lacks an adequate remedy at law for being subjected to a body cavity search in public pursuant to police policy. In *Bell*, the Supreme Court described the balancing test we are to use to determine whether a particular search is reasonable under the Fourth Amendment. 441 U.S. at 559. That test weighs the magnitude of the invasion of personal privacy against the governmental interest in conducting the particular searches in question. 441 U.S. at 559-60. Moreover, "[o]ne of the critical, and certainly most obvious, elements in the *Bell v. Wolfish* balancing inquiry into the reasonableness of the strip search is 'the place in which it is conducted.'" *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) (quoting *Bell*, 441 U.S. at 559).

This court in *Mary Beth G.* found that strip searches of women arrested for misdemeanor offenses conducted at the city lockup while they awaited bond were unreasonable under the *Bell* balancing test and thereby violated the Fourth Amendment. *Mary Beth G.*, 723 F.2d at 1273. Citing, *inter alia*, this court's decision in *Tinetti*, the *Mary Beth G.* court found the magnitude of the state's intrusion into the plaintiffs' privacy was extremely high. *Id.* at 1272 ("we can think of few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here" where detainees were made to squat and bend over to permit inspection of their vaginal and anal areas). The privacy concerns triggered by the particular searches under scrutiny were found to outweigh the City of Chicago's proffered need to conduct the searches (to prevent misdemeanor offenders

from bringing in weapons or contraband into the City lockups), as the perceived security risks of not doing the searches was not borne out by the evidence in the record. *Id.* at 1272-73. The searches in *Mary Beth G.* were conducted without even reasonable suspicion that the plaintiffs posed security risks to the lockup by possibly concealing weapons or contraband and were thereby found unconstitutional. *Id.* at 1273. If the searches in *Mary Beth G.* were unreasonable when they were conducted on misdemeanor offenders during a brief time of detention in a City lockup without reasonable suspicion that they posed a security threat to the lockup, then it is hard to see how conducting a body cavity search, also during a brief period of detention, but *in public*, of a suspected misdemeanor offender, who incontrovertibly posed no threat to the arresting officers' security, could be constitutionally sound. *See, e.g., Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001) (noting that "we have repeatedly emphasized the necessity of conducting a strip search in private" and concluding "[t]he fact that, absent clear justification or exigent circumstances, an officer is not allowed to strip an arrestee on a public street pursuant to a search incident to an arrest necessarily means that an officer cannot go even further than simply disrobing the arrestee by actually touching and penetrating the arrestee's exposed genitalia on the public street."); *United States v. Ford*, 232 F. Supp. 2d 625, 630 (E.D. Va. 2002) (granting a motion to suppress, stating "[t]aking the *Bell* factors into account, the Court concludes that the police officer engaged in a highly invasive search by exposing the defendant's buttocks on the side of a public highway in broad daylight, and that the search violated the defendant's Fourth Amendment protection").

That the search of Campbell was conducted in public significantly increases the severity of the governmental intrusion involved here. The defendants' professed reasons for the policy in all likelihood cannot justify such extreme

incursions in a person's privacy under the Fourth Amendment. That the policy confers unbridled discretion on the officers and does not even require reasonable suspicion for an officer to conduct a strip and body cavity search (recall, the defendants write in their brief that an officer can submit a citizen to such a search "if the officer feels it is necessary") makes the likelihood of the IPD policy's unconstitutionality only greater. The Constitution clearly requires at least reasonable suspicion for a law enforcement officer to subject a person to such a search. *See Mary Beth G.*, 723 F.2d at 1273; *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997) (citing cases holding the same in the Fifth, Sixth, and Eleventh Circuits). *See also Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1446-47 (9th Cir. 1991) (holding that strip and body cavity searches conducted incident to arrest but without reasonable suspicion violated the Fourth Amendment; also, searches conducted with reasonable suspicion that arrestee is carrying weapons or *dangerous* contraband is constitutional, while conducting such invasive searches "*in order to discover and seize the fruits or evidence of crime*" is not constitutional (emphasis added)). Finally, the defendants "cannot reasonably assert that [they are] harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1985).

Moreover, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (citing 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948.1 (1973)). *See also* 11A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2948.1 (2d ed. 1995) (same); *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960) ("The District Court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right" (citing cases)). *Cf.*

*National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("Even a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm."). In other words, Campbell can establish the irreparable harm element by demonstrating a violation of his constitutional rights. Furthermore, showing irreparable harm is "[p]robably the most common method of demonstrating that there is no adequate legal remedy." 11A Wright, Miller & Kane, Federal Practice and Procedure § 2944. *See also Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1098 (7th Cir. 1988) ("To say that the injury is *ir*reparable means that the methods of repair (remedies at law) are inadequate." (emphasis in original)).[3]

Furthermore, contrary to the majority's suggestion that "[i]f this court decides that the City's practice is unconstitutional then it must cease . . . (for the prospect of damages paid to thousands of suspects would bring the City into line)," *supra* p. 2, courts have recognized that the possibility of money damages engenders only meager if any deterrent effect against police incursions on Fourth Amendment rights. *See, e.g., Lankford v. Gelston*, 364 F.2d

---

[3] Other cases involving significant intrusions of privacy representing unreasonable searches under the Fourth Amendment also suggest that there is no adequate remedy at law for Campbell. *See, e.g., Bannister v. Bd. of County Comm'rs of Leavenworth County, Kan.*, 829 F. Supp. 1249, 1252 (D. Kan. 1993) ("Because the injury inflicted by an unconstitutional drug test cannot be remedied by a damage award, the court concludes that plaintiff has established that she will be irreparably harmed if an injunction does not issue."); *Am. Fed'n of Gov't Employees, Local 1857 v. Wilson*, No. Civ. S-89-1274 LKK, 1990 WL 208749 at *14 (E.D. Cal. July 9, 1990) (granting an injunction, stating "Urinalysis drug testing is an invasive, degrading and humiliating procedure and the injury inflicted by a constitutional violation of this character cannot be remedied by a damage award.").

197, 202 (4th Cir. 1966) (granting a preliminary injunction to protect against police violations of plaintiffs' Fourth Amendment rights when, *inter alia*, "the lesson of experience is that the remote possibility of money damages serves no deterrent to future police invasions" (citing *Mapp v. Ohio*, 367 U.S. 643, 651-52 (1961) (where the Supreme Court recognized "[t]he obvious futility of relegating the Fourth Amendment of the protection of other remedies [such as criminal or civil sanctions]")). *See also Elkins v. United States*, 364 U.S. 206, 220 (1960) (citing with approval the California Supreme Court which held "experience has demonstrated, however, that neither administrative, criminal nor civil remedies are effective in suppressing lawless searches and seizures."). In sum, Campbell has sufficiently alleged an injury of a type for this court to properly conclude that Campbell lacks an adequate remedy at law.

Moreover, the cases the majority cites to support its conclusion that money damages are an adequate remedy for an unconstitutional search are readily distinguishable from the case at bar. *Sampson v. Murray*, 415 U.S. 61 (1974) dealt with the extent of federal courts' power to issue injunctions upon claims by federal government employees that their civil service rights have been violated. *Sampson* involved a probationary government employee's wrongful discharge which the Supreme Court construed as a "routine case" lacking the extraordinary circumstances which would warrant a finding of irreparable injury. *Id.* at 92 n.68. The plaintiff in *Sampson* alleged embarrassment and damage to her reputation when her employer discharged her in a manner inconsistent with administrative procedural rules. Not only does Campbell's case not involve federal government personnel actions, but the harm the *Sampson* plaintiff complained of is hardly comparable to the harm, described at length by this court in *Mary Beth G.*, that one experiences as a result of having one's most private parts fondled

by a law enforcement officer. This point is at least doubly true for Campbell who was subjected to such an intrusive search *in public.*

*Second City Music, Inc. v. Chicago*, 333 F.3d 846 (7th Cir. 2003) is also distinguishable from Campbell's case. *Second City* involved a city ordinance which required dealers of used audio and video equipment to obtain licenses in order to sell such merchandise, a measure aimed at preventing the dealers from becoming "fences for thieves." 333 F.3d at 847. In response to the plaintiff's request for an injunction preventing the city from applying the ordinance to established businesses, we found that requiring the plaintiff to apply for a license to continue to operate its business would incur "no detriment*." Id.* at 849. Any analogy between requiring a used CD shop to obtain a license and a person to submit to an exceedingly invasive search in public is strained at best. The harms involved in *Second City* and the case at bar are not comparable— neither in degree nor in sort.

The same can be said for *Webb v. Board of Trustees of Ball State University*, 167 F.3d 1146 (7th Cir. 1999). In that case, no irreparable harm warranting a preliminary injunction was found when plaintiffs, state university employees, alleged university retaliation against them for protected speech.[4] Again, a "brouhaha" within a university department leading to a replacement of plaintiff professor as department chair does not rise to the level of harm involved, acknowledged by the Supreme Court and several circuits, when police conduct a body cavity search, never mind when it is done in public.

Finally, the majority cites *Wilson v. Garcia*, 471 U.S. 261 (1985). That case dealt with how to construe actions for damages brought under 42 U.S.C. § 1983 for statute of lim-

---

[4] No First Amendment violation was found in this case.

itation purposes. Not only did that case involve a request for damages only and not injunctive relief, but to the extent that *Wilson* analogizes a constitutional wrong to a personal-injury tort, it does so for statute of limitation purposes. The case in and of itself provides no comment to support the majority's broader claim that damages are a normal and adequate response to an improper search or seizure.

## III. Standing

In *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), the Supreme Court set forth a two-part test that plaintiffs must satisfy in order to demonstrate standing for a preliminary injunction: a plaintiff must "allege that he would have another encounter with the police" and, in pertinent part, "that the City ordered or authorized police officers to act" in the manner about which the plaintiff complains. *Id.* at 105-06. Campbell has satisfied the second part of that test as he has sufficiently alleged, and the defendants admitted,[5] that the IPD officers subjected Campbell to a body cavity search in public pursuant to IPD policy.[6] In other words, IPD General Order 18.02 and Executive Committee of the Marion County Superior Court Order of April 18, 2002 together authorize such searches and the police officer

---

[5] *Compare* Pl.'s Am. Compl. ¶ 56 ("The search performed on Plaintiff James Campbell was performed pursuant to a practice or policy of the Indianapolis Police Department.") *with* Defs.' Answer to Am. Compl. ¶ 42 ("Defendants admit the material allegations in paragraph 56.").

[6] While this court must review the district court's findings of fact for clear error, *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474 (7th Cir. 2001), the district court in this case made no findings of fact on this issue. However, the defendants admit that the search at issue in this case was done pursuant to IPD policy or practice.

defendants were within their (apparently unbridled) discretion, as interpreted by IPD Chief Barker, when they conducted the invasive search in public of Campbell's private parts.

As for the first part of the *Lyons* standing test, requiring a plaintiff seeking a preliminary injunction to show that he faces a real threat of another encounter with the police of the type alleged in his complaint, there are several factual allegations present in Campbell's case on which basis courts have found standing for a preliminary injunction, even when presented with somewhat speculative claims of future harm. Courts have paid judicial notice to the following facts, alleged in Campbell's case, in finding a party had standing for a preliminary injunction: (1) the police acts to which the plaintiff was subjected and about which he complains were authorized by police policy; or (2) the police policy did not clearly limit the occasions in which the police activity could take place.

As my research to date has not yielded a Seventh Circuit case directly on point, I look to outside authority. Case law from our sister circuits suggests that Campbell has standing for a preliminary injunction to enjoin defendants from conducting body cavity searches against him. For example, in *Deshawn E. v. Safir*, 156 F.3d 340, 345 (2d Cir. 1998), the Second Circuit distinguished *Lyons* and found standing for injunctive relief in large part because the challenged police activities were "officially endorsed policies." It found that "there is a likelihood of recurring injury because the [police] Squad's activities are authorized by a written memorandum of understanding between the Corporation Counsel and the Police Commissioner." *Id.* In other words, the existence of a written policy authorizing the complained-of police conduct, present in Campbell's case, bolsters a claim of future harm.

The Ninth Circuit's decision in *Thomas v. County of Los Angeles*, 978 F.2d 504 (9th Cir. 1993) reached a similar

conclusion. It found standing for a preliminary injunction when plaintiffs alleged, *inter alia*, that the challenged police conduct was "condoned and tacitly authorized by [sheriff] department policy makers." *Id.* at 508. As in *Thomas*, Campbell has alleged, and the defendants have admitted, that the police officers subjected Campbell to a body cavity search in public, consistent with IPD policy or practice.

Addressing whether "the same events are likely to happen again to [Campbell]", *supra* p. 2, Campbell contends that these invasive public searches are done with some degree of frequency. Defendant Officer Miller testified that he alone has conducted twenty to thirty such searches. He also testified that he has observed other officers performing the invasive searches. Defendant Andrew Lamle, another Indianapolis police officer, testified that he too has conducted "similar searches." While there is insufficient evidence in the record to determine what percentage of total summons arrests involved public strip and/or body cavity searches (nor is it clear whether the IPD even keeps such records),[7] there is enough evidence in the record to show that what Campbell was subjected to was not aberrational. And as noted in *National Congress for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999), "[c]ourts have not been hesitant to grant standing to sue for injunctive relief where numerous constitutional violations have resulted from a policy of unconstitutional practices by law enforcement officers" (citing *Allee v. Medrano*, 416 U.S. 802, 815 (1974) and *Thomas*, 978 F.2d at 508).

---

[7] Here, for instance, although it is undisputed that Officer Miller performed a public strip search of Campbell, the official case report narrated by Officer Miller states that Campbell was issued a summons for possession of marijuana but makes no mention whatsoever of the strip search.

Lastly, the fact that the IPD policy, pursuant to which the police officer defendants acted when they conducted a body cavity search of Campbell in public, places no limit on when an officer may submit a summons arrestee to such searches supports Campbell's standing claim. In *Lyons*, the Supreme Court took judicial notice of the limitations the Los Angeles police policy placed on police use of chokeholds which were challenged in that case. In the context of assessing whether Lyons would be subjected to an illegal chokehold again in the future, the Court stated, "police officers were instructed to use chokeholds only when lesser degrees of force do not suffice and then only 'to gain control of a suspect who is violently resisting the officer or trying to escape.'" *Lyons*, 461 U.S. at 110 (quoting the record). In the Court's judgment, the fact that there was a constraint on police use of the stranglehold weakened the plaintiff Lyons's claim of standing. *Id.*

However, there is no comparable constraint on IPD officers in the case at bar. The defendants state in their appellate brief that an IPD officer may conduct such an invasive search in public "if the officer feels it is necessary." Moreover, IPD Chief Barker testified that the application of the search policy is dependent on "[r]easonableness and discretion of the officer, based on the totality of the circumstances" an officer faces. However, Fourth Amendment jurisprudence discussed above indicates that the search challenged here is in all likelihood never reasonable, given the severity of the intrusion and the fact that it is conducted in public. So allowing an officer to conduct such a search whenever he "feels it is necessary" in his discretion functionally places no limit on the application of the policy. The defendants' citation to *United States v. Robinson*, 414 U.S. 218 (1973) on the issue of officer discretion does not undermine Campbell's claim, because as we stated in *Mary Beth G.*, "[t]he Court [in *Robinson*] did not suggest that a person validly arrested may be subject to *any* search the arresting officer feels is necessary." 723 F.2d at 1269

(emphasis in original). Such broad discretion conferred upon IPD officers, combined with the fact that the body cavity search is consistent with IPD policy, only increase the likelihood that Campbell will be subjected to the public body cavity search again in the future.

Further, the list of misdemeanors for which a person may be subjected to a body cavity search in public, *see* sources cited *supra* note 2, not only underscores the policy's unreasonableness, but also multiplies the likelihood that Campbell will be subjected to such a search in the future.

I respectfully dissent.

A true Copy:

　　　　Teste:

　　　　　　　　　_____
　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　*Appeals for the Seventh Circuit*