In the

# United States Court of Appeals

## For the Seventh Circuit

—————————

No. 18-1050

ANTONIO LOPEZ-AGUILAR,

*Plaintiff-Appellee,*

*v.*

MARION COUNTY SHERIFF'S DEPARTMENT,
et al.,

*Defendants-Appellees.*

APPEAL OF: STATE OF INDIANA,

*Proposed Intervenor.*

—————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cv-02457-SEB-TAB — **Sarah Evans Barker**, *Judge.*

—————————

ARGUED SEPTEMBER 7, 2018 — DECIDED MAY 9, 2019

—————————

Before FLAUM, RIPPLE, and BARRETT, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Antonio Lopez-Aguilar brought this action against the Marion County Sheriff's Department ("the Sheriff's Department"), Sheriff John R. Layton, in both his official capacity and his individual capacity, and a sergeant

of the Sheriff's Department, in his individual capacity (together, "the defendants"). His complaint set forth one claim under 42 U.S.C. § 1983. He alleged that when the defendants detained him for transfer into the custody of Immigration and Customs Enforcement ("ICE"), they violated his Fourth Amendment rights.[1] Mr. Lopez-Aguilar also brought supplemental claims, based on Indiana law, for false arrest and false imprisonment. His complaint sought damages and a declaration that the defendants had violated his rights by detaining him. He did not seek injunctive relief.

The parties later proposed, and the district court subsequently entered, a Stipulated Final Judgment and Order for Permanent Injunction ("the Stipulated Judgment"), which granted declaratory and prospective injunctive relief but dismissed with prejudice Mr. Lopez-Aguilar's damages claims. Following the entry of final judgment, but within the time for appeal, the State of Indiana ("the State" or "Indiana") moved to intervene for the purpose of appealing the district court's order entering the Stipulated Judgment. The district court denied Indiana's motion to intervene. The State now appeals that denial.

Indiana has standing for the purpose of bringing this appeal. The State's motion to intervene was timely, and it also fulfilled the necessary conditions for intervention of right. Finally, the State has demonstrated that the district court was without jurisdiction to enter prospective injunctive re-

---

[1] The Fourth Amendment to the Constitution of the United States is made applicable to the states by the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

lief. Therefore, for the reasons set forth more fully below, we reverse the judgment of the district court and remand the case for proceedings consistent with this opinion.

## I.

## BACKGROUND

### A.

On September 18, 2014, Mr. Lopez-Aguilar came to the Marion County Courthouse in Indianapolis to attend a hearing on a criminal misdemeanor complaint charging him with driving without a license. When he arrived, officers of the Sheriff's Department informed him and his attorney that an ICE officer had come to the courthouse earlier that day looking for him.[2] He alleges that a Sergeant Davis took him into custody. Later that day, Mr. Lopez-Aguilar appeared before the traffic court and resolved his misdemeanor charge. That disposition did not include a sentence of incarceration. Sergeant Davis nevertheless again took Mr. Lopez-Aguilar into custody, informing him that he would be held until the Sheriff's Department could transfer him to ICE's custody. Mr. Lopez-Aguilar consequently remained at the Marion County jail overnight; the next day, county officers transferred him to ICE. Neither federal nor state authorities charged Mr. Lopez-Aguilar with a crime, and he did not ap-

---

[2] Kevin Wies, the ICE officer who claimed responsibility for Mr. Lopez-Aguilar's immigration detention and arrest, stated in a declaration that, based on a fingerprint match in the ICE database, he had asked the Sheriff's Department to communicate with him about Mr. Lopez-Aguilar. According to Officer Wies, ICE never issued either a written or an informal detainer for Mr. Lopez-Aguilar.

pear before a judicial officer. ICE subsequently released him on his own recognizance. An unspecified type of "immigration case" against Mr. Lopez-Aguilar was pending when he later filed this action.[3]

**B.**

On September 15, 2016, Mr. Lopez-Aguilar initiated this litigation by filing a complaint against the Sheriff's Department, Sheriff Layton, and Sergeant Davis. As noted earlier, he asserted a claim for violation of the Fourth Amendment under 42 U.S.C. § 1983 as well as state law claims for false arrest and false imprisonment. Following the exchange of discovery, the parties agreed to settle the case to "avoid the cost and uncertainty of continued litigation."[4] Specifically, on July 10, 2017, Mr. Lopez-Aguilar and the defendants jointly proposed to the district court a Stipulated Judgment. Indiana news outlets reported this proposed Stipulated Judgment in the days following its filing. On July 13, 2017, the United States filed a request for time to submit a pleading addressing the parties' proposed settlement. The district court granted that motion, and, on August 4, 2017, the United States filed a statement of interest objecting to the Stipulated Judgment. The news media also reported the Government's opposition to the parties' agreement.

In its statement, the United States noted that the Immigration and Nationality Act ("INA") authorized the Sheriff's Department to cooperate with the enforcement of federal immigration laws. Further, the Government submitted, the

---

[3] R.1 ¶ 23.

[4] Lopez-Aguilar Br. 6.

Sheriff's Department's cooperation with ICE did not violate the Fourth Amendment. The United States disputed whether the defendants' detention of Mr. Lopez-Aguilar amounted to an unlawful seizure. Even if there had been an unlawful seizure, continued the Government, the permanent injunction was improper because it imposed relief far beyond any actual injury to Mr. Lopez-Aguilar.

After considering the positions of the parties and the Government, the district court approved the Stipulated Judgment and then entered a final judgment declaring that:

> [S]eizures by the defendants of any person based solely on detention requests from [ICE], in whatever form, or on removal orders from an immigration court, violate the Fourth Amendment, unless ICE supplies, or the defendants otherwise possess, probable cause to believe that the individual to be detained has committed a criminal offense; [and]
>
> … [F]or the avoidance of doubt, an ICE request that defendants seize or hold an individual in custody based solely on a civil immigration violation does not justify a Fourth Amendment seizure … .[5]

Further, the district court permanently enjoined the defendants from "seizing or detaining any person based solely on detention requests from ICE, in whatever form, or on removal orders from an immigration court, unless ICE sup-

---

[5] R.50 at 1–2.

plies a warrant signed by a judge or otherwise supplies probable cause that the individual to be detained has committed a criminal offense."[6]

The district court also issued an opinion to explain its approval of the Stipulated Judgment. The court first considered whether the Stipulated Judgment would require the Sheriff's Department to violate Indiana law. A statutory provision prohibits a governmental body, such as the Sheriff's Department, from implementing a policy that "prohibits or in any way restricts" law enforcement officers from taking certain actions "with regard to information of the citizenship or immigration status" of a person, such as "[c]ommunicating or cooperating with federal officials." Ind. Code § 5-2-18.2-3. The district court determined, however, that because the Stipulated Judgment only prohibited the Sheriff's Department from "seizing" or "detaining" certain individuals, "not from communicating with or about them," the Stipulated Judgment posed no conflict.[7] The district court then examined another provision that forbids a state governmental body from "limit[ing] or restrict[ing] the enforcement of federal immigration laws to less than the full extent permitted by federal law." Ind. Code § 5-2-18.2-4. The district court conceded difficulty in interpreting and applying this provision. It nevertheless determined that, if the provision simply prohibits a state governmental body from requiring or permitting anything less than cooperation with federal immigration enforcement to the full extent such co-

---

[6] *Id.* at 2.

[7] R.49 at 17.

operation is permitted by federal law, there is no conflict with the Stipulated Judgment. In the district court's view, without an express agreement with the United States Attorney General or some other Congressionally-approved arrangement, state cooperation with federal immigration authorities did not contemplate state enforcement of removal orders or ICE detainers. The INA preempted any such requirement. Additionally, said the court, any such state enforcement absent probable cause would violate the Fourth Amendment. Accordingly, the district court found that the Stipulated Judgment did not require the Sheriff's Department to violate Indiana law.[8]

The district court next considered whether the Stipulated Judgment complied with the strictures of *Local No. 93, International Association of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986). That case requires the district court to determine that a proposed consent decree "(1) spring[s] from and serve[s] to resolve a dispute within the court's subject matter jurisdiction; (2) come[s] within the general scope of the case made by the pleadings; and (3) further[s] the objectives of the law upon which the complaint was based." *Komyatti v. Bayh*, 96 F.3d 955, 960 (7th Cir. 1996) (quoting *Local No. 93*,

---

[8] The district court also determined that the Stipulated Judgment did not conflict with Indiana Code §§ 5-2-18.2-5, 6. Section 5 creates a private right of action for violations of Chapter 18.2, *id.* § 5-2-18.2-5, and Section 6 requires a state court that finds a knowing or intentional violation of this chapter to enjoin the violation, *id.* § 5-2-18.2-6. According to the district court, because these provisions "impose[] no duties" on the Sheriff's Department, there was no conflict. R.49 at 17. The State does not challenge the district court's rulings regarding Sections 5 and 6 in this appeal.

478 U.S. at 525) (alteration omitted) (internal quotation marks omitted). The district court concluded that the Stipulated Judgment satisfied these requirements because: (1) it would resolve Mr. Lopez-Aguilar's § 1983 claim, which was within the court's subject-matter jurisdiction, by terminating the litigation; (2) restricting the defendants' ability to cooperate with ICE was within the scope of Mr. Lopez-Aguilar's complaint that the defendants had unlawfully seized and detained him; and (3) the Stipulated Judgment "further[ed] Fourth Amendment values" by limiting "state intrusions on individual privacy."[9] Further, "to the extent the remedy in the Stipulated Judgment exceed[ed] the Fourth Amendment's requirements," the district court ruled, it was "directly related to the elimination of the condition alleged to offend the Fourth Amendment."[10]

Finally, the district court evaluated whether the Stipulated Judgment was fair and reasonable. The district court acknowledged that Mr. Lopez-Aguilar "appear[ed] to have a strong case," but noted that "litigating the merits" would involve difficult disputes over the defendants' qualified immunity defense and the facts surrounding his detention.[11] Finally, the district court considered the Government's position. It rejected the Government's view that the relief exceeded the scope of the alleged injury and therefore violated the rule set forth in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). In the court's view, "if Indiana law does not conflict

---

[9] R.49 at 31.

[10] *Id.* at 32.

[11] *Id.* at 33.

with the Stipulated Judgment, then Marion County and Lopez-Aguilar are free to contract for nearly any remedy they desire."[12] Finally, the court determined that the Stipulated Judgment was consistent with the public interest and would be judicially manageable.

The district court approved and entered the Stipulated Judgment on November 7, 2017. According to the State, following the entry of final judgment, "an attorney at the United States Department of Justice informally advised the Office of the Indiana Attorney General that the State may have interests at stake in the case."[13] Consequently, on December 4, 2017, the State moved for intervention of right or, alternatively, for permissive intervention, in order to appeal the district court's order entering the Stipulated Judgment. On the same date, the State requested a thirty-day extension of time to file a notice of appeal, which the district court granted. The district court concluded that it was appropriate to grant the State's motion for extension of time given that "[t]he State was not involved in, and did not necessarily have cause to know of, the course of litigation in this case before filing its intervention and extension motions, and appear[ed] to have sought to protect its interests as soon as was practicable upon learning of the Stipulated Judgment."[14]

Mr. Lopez-Aguilar and the defendants opposed the State's request to intervene, and, on January 5, 2018, the dis-

---

[12] *Id.* at 34.

[13] Appellant's Br. 14.

[14] R.58 at 4 (emphasis omitted).

trict court denied the State's motion. First, the district court found that the State had failed to establish Article III standing to intervene because it had not demonstrated an injury-in-fact and because any injury suffered by the State would not be redressable by taking an appeal. The court acknowledged that a state has a legally protected interest in the continued enforceability of its laws and that this interest is harmed when a court holds that a state law is unconstitutional. But the district court reasoned that it had not held a state law unconstitutional; it had simply construed a state statute as not requiring that law enforcement officers cooperate with removal orders, standing alone, or with immigration orders, standing alone. A disagreement about the interpretation of a statute is not, held the district court, sufficient to establish a cognizable injury-in-fact. The district court further held that any injury the State suffered was not redressable. Relying on our decisions in *1000 Friends of Wisconsin Inc. v. United States Department of Transportation*, 860 F.3d 480 (7th Cir. 2017), and *Kendall-Jackson Winery, Ltd. v. Branson*, 212 F.3d 995 (7th Cir. 2000), the court concluded that any judicial relief obtained on appeal (i.e., vacation of the Stipulated Judgment) would remedy the State's injury only in a contingent and collateral way.

The district court went on to say that, even if Indiana had standing to intervene, its motion would fail under Federal Rule of Civil Procedure 24 because it was untimely. Further, the court continued, even assuming that the motion was timely, the State was not entitled to intervene as of right because it had not asserted "a direct, significant, and protectable interest unique to the State which will be impaired by the

denial of its motion to intervene."[15] Finally, the district court held that the State was not entitled to permissive intervention because it had failed to satisfy the requirements of Rule 24(b). The State timely appealed from the denial of intervention.

## II.

## DISCUSSION

## A.

In reviewing the district court's decision, we begin with a basic principle: "It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *Lyons*, 461 U.S. at 101. We therefore must examine, as a threshold matter, whether the State of Indiana has the requisite standing to intervene in this case. This is a question of law, which we review de novo. *Winkler v. Gates*, 481 F.3d 977, 982 (7th Cir. 2007).

To establish standing, a plaintiff must satisfy three criteria. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must, as an "irreducible constitutional minimum," demonstrate "injury in fact," "an invasion of a legally protected interest" which is both "concrete and particularized," not "conjectural or hypothetical." *Id.* (internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly … trace[able] to the chal-

---

[15] R.62 at 17.

lenged action of the defendant … .'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976)). Third, the plaintiff must demonstrate that a favorable decision by the court is likely to remedy the claimed injury. *Id.* at 561. Here, two of these factors—whether the State suffered an injury-in-fact and whether its claimed injury can be redressed by this court—deserve a close examination.

We first consider whether the State has demonstrated sufficient injury-in-fact. The State contends that the Stipulated Judgment interferes *directly and substantially* with the use of its police power to cooperate with the federal government in the enforcement of the Country's immigration laws. Mr. Lopez-Aguilar, agreeing with the district court, emphasizes that the injunction does not render the state statutes unconstitutional; it merely interprets them. In his view, Indiana's injury is therefore not a significant one. Mr. Lopez-Aguilar further suggests that if the State could intervene in any litigation where its Attorney General disagreed with a judicial interpretation of a state statute, the State would have the right to intervene in all sorts of private litigation.

Mr. Lopez-Aguilar's characterization artificially minimizes the particular interest that the State seeks to vindicate here. Indiana seeks to protect a state prerogative of constitutional dimension. The Supreme Court has recognized specifically that a state has a cognizable interest sufficient to establish Article III standing in the "continued enforceability of its own statutes," even when another party with an aligned interest has determined not to appeal. *Maine v. Taylor*, 477 U.S. 131, 137 (1986). Although the district court did not declare Section 4 unconstitutional in all respects, it did hold that

Fourth Amendment considerations and the preemptive effect of the INA required that the statute be given a restrictive reading. That reading is so restrictive as to preclude state officers from cooperating with federal officers with respect to ICE detainers or immigration court removal orders. The district court's interpretation of the statute, although not a total declaration of unconstitutionality, restricts significantly the vitality of the statute and the capacity of the State to cooperate with the federal government. Indiana has demonstrated that it has suffered a cognizable injury sufficient for standing to appeal. *See Taylor*, 477 U.S. at 137 (holding that the State of Maine, an intervenor in the district court and the only appealing party, had standing to appeal because, "if the judgment of the Court of Appeals [was] left undisturbed," Maine would "be bound by the conclusive adjudication" that its law was unenforceable).

We next consider whether the State's claimed injury is redressable. Mr. Lopez-Aguilar observes that the district court's injunction runs solely against Marion County officials. It does not run against any state official. In his view, we could not grant Indiana relief because it seeks to set aside an injunction against a non-appealing party. He views this rule as an ironclad one, admitting of no exceptions. To support this broad assertion, Mr. Lopez-Aguilar invites our attention to our decision in *Kendall-Jackson Winery*. There, three suppliers of alcoholic beverages sought an injunction against state officials preventing the enforcement of a newly enacted statute that forbade the suppliers to cancel distribution agreements without good cause. 212 F.3d at 996. In bringing the suit against the state officials, these suppliers also had named their previous distributors as defendants. The court entered a preliminary injunction against the state officials,

enjoining them from enforcing the statute. *Id.* The state officials did not take an appeal, but the distributor-defendants did. *Id.* We held that the distributors did not have standing to appeal because the district court's injunction ran against only the state officials. *Id.* at 997–98. As long as those officials acquiesced in the imposition of the injunction, the distributors could obtain no relief. *Id.* at 998. Their injury was derivative; they were harmed only indirectly by the inability of the state officials to issue orders that would protect the distributors' interests. *Id.*

Our later cases have confirmed the continued vitality of this rule. In *Cabral v. City of Evansville*, 759 F.3d 639 (7th Cir. 2014), residents of the City of Evansville brought an action against the City challenging the City's approval of a two-week display of numerous six-foot crosses along public riverfront property. *Id.* at 641. The district court entered a permanent injunction; it barred the City from granting a permit for the erection of the display. *Id.* The applicant, the West Side Christian Church, was an intervenor in the district court but was not subject to the injunction. *Id.* The City did not appeal the district court's decision to enter a permanent injunction, but the Church did. *Id.* We dismissed the appeal because the Church did not have standing. *Id.* We emphasized that only the City, not the Church, was subject to the injunction. *Id.* at 642. If we vacated the injunction at the Church's request, it would not alter whether the Church was permitted to erect the crosses. *Id.* It would simply allow the City, a stranger to the appeal, to determine whether to permit the crosses. *Id.* Any injury that the Church would suffer, we concluded, was "derivative" of the City's injury. *Id.*

We then went on to express our holding another way. We said that it was a basic rule of appellate procedure that "a judgment will not be altered on appeal in favor of a party who did not appeal [even if] the interests of the party not appealing are aligned with those of the appellant." *Id.* at 643 (quoting *Albedyll v. Wis. Porcelain Co. Revised Ret. Plan*, 947 F.2d 246, 252 (7th Cir. 1991)). Relying on *Kendall-Jackson*, we wrote that "[t]he critical question is this: when a district judge enters an order creating obligations only for Defendant A, may the court of appeals alter the judgment on appeal by Defendant B when obligations imposed on A *indirectly* affect B?" *Id.* (quoting *Kendall-Jackson*, 212 F.3d at 998) (emphasis added).

Our more recent decision in *1000 Friends of Wisconsin* presented a similar situation. Wisconsin, desirous of widening a road between Fond du Lac and Sheboygan, sought the release of federal funds for the project. 860 F.3d at 481. The United States Department of Transportation released an environmental impact statement evaluating the potential effects of the project and then issued a "record of decision permitting the use of federal funds." *Id.* At that point, a group opposed to the project brought suit, asking the district court to determine that the impact statement was inadequate and to enjoin the project. *Id.* The district court declined to enjoin the project but did set aside the "record of decision." *Id.* The United States Department of Transportation then issued a revised impact statement, but the district court continued to deem it inadequate. *Id.* Only the *Wisconsin* Department of Transportation and one of its employees appealed the district court's decision; the United States Department of Transportation did not. *Id.* We held that the Wisconsin authorities did not have standing to appeal. *Id.* at

483. We stressed that, under the statute governing environmental impact statements, state authorities had no duties. *Id.* at 482. They remained free to undertake the project with state funds. *Id.* Only the federal authorities were subject to the court's order disapproving of the environmental impact statement, and the State could not substitute itself for the federal agency that had responsibility for the statement. *Id*. Any harm to Wisconsin was indirect; it could not obtain federal funds, but it remained free to proceed on its own.

In Mr. Lopez-Aguilar's view, our holdings in these cases are dispositive. Although his argument has superficial appeal, on reflection, we cannot accept it. Here, we are not dealing with the derivative injury of a private party whose interests are dependent on the enjoined party. Rather, the district court has enjoined a subordinate component of state government from acting in accordance with the directive of the state legislature. Indiana alleges a direct injury to its capacity to require subordinate entities of state government to act in accordance with state law. In its sovereign capacity, the State seeks to vindicate its authority to require officials of subordinate units of government to fulfill their responsibilities. The State maintains that the Stipulated Judgment directly frustrates its prerogatives and confounds its efforts to be supportive of federal policy. Indiana contends, in essence, that the subordinate officers of state government have abdicated their responsibilities by agreeing to the district court's injunction. The State seeks to protect its sovereign prerogative to cooperate with the federal government and to require subordinate entities of state government to comply with that legislative policy directive.

Mr. Lopez-Aguilar reminds us that the defendants have no statutory duty to appeal the district court's judgment. Those officials do have a statutory duty, however, to obey state law. Indiana simply asks that we vacate a federal district court order requiring local law enforcement officers in Marion County to act in perpetuity contrary to state law. Such relief will remedy directly the injury to the State's sovereign interest in implementing a state-wide legislative policy of full cooperation with federal immigration law. Because the State established a cognizable injury-in-fact, *see Taylor*, 477 U.S. at 137 (recognizing that "a State clearly has a legitimate interest in the continued enforceability of its own statutes"), and because we can directly redress that injury by vacating the Stipulated Judgment, we conclude that the State has standing to bring this appeal.

**B.**

**1.**

Having presented a justiciable case or controversy, Indiana still must comply with the requirements of Rule 24. A prerequisite for both intervention of right and permissive intervention is that the motion to intervene must be timely. Fed. R. Civ. P. 24(a), (b). Mr. Lopez-Aguilar submits that the district court correctly held that, even if the State had standing to appeal, its motion to intervene was not timely.

As detailed above, Mr. Lopez-Aguilar and the defendants jointly filed the Stipulated Judgment with the district court on July 10, 2017. Three days later, on July 13, 2017, the United States filed a request for time to submit a Statement of Interest, which the district court granted. On August 4, 2017, the United States filed its Statement of Interest oppos-

ing entry of the Stipulated Judgment. The district court nevertheless approved and entered the Stipulated Judgment on November 7, 2017. According to the State of Indiana, following entry of the Stipulated Judgment, "an attorney at the United States Department of Justice informally advised the Office of the Indiana Attorney General that the State may have interests at stake in the case."[16] Consequently, on December 4, 2017, the State moved to intervene in order to appeal the district court's order entering the Stipulated Judgment. On the same date, the State requested, and the district court granted, a thirty-day extension of time to file a notice of appeal.

In its order granting the extension of time, the district court explained that, "[e]ven with the exercise of due diligence, the State would not necessarily have had earlier notice of this lawsuit and our entry of final judgment."[17] The court further observed that:

> [P]ublished news items and broadcast media coverage included discussions of this lawsuit both before and after final judgment was entered. It is not far-fetched to presume that State government officials would take the appropriate steps to keep abreast of legal proceedings touching on major questions of public policy involving its capital city's government. That said, we know of no legal duty imposed on the

---

[16] Appellant's Br. 14.

[17] R.58 at 3.

State to track every lawsuit implicating an in-
terpretation of Indiana law—the primary basis
for the State's intervention motion—and we
have no reason to believe that the State had ac-
tual notice of this lawsuit before its filing of the
motions now before us.[18]

The district court concluded that it was appropriate to grant the State's motion for extension of time to appeal given that "[t]he State was not involved in, and did not necessarily have cause to know of, the course of litigation in this case before filing its intervention and extension motions, and appear[ed] to have sought to protect its interests as soon as was practicable upon learning of the Stipulated Judgment."[19] Despite these findings, on January 5, 2018, the district court denied the State's motion to intervene. Among other grounds, the court determined that the State's motion failed for lack of timeliness.

We have stated, in the context of Rule 24, that "[t]imeliness is not limited to chronological considerations but is to be determined from all the circumstances." *City of Bloomington v. Westinghouse Elec. Corp.*, 824 F.2d 531, 534 (7th Cir. 1987) (internal quotation marks omitted). We consider four factors to determine whether a motion to intervene is timely: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice

---

[18] *Id.* at 3–4.

[19] *Id.* at 4 (emphasis omitted).

to the intervenor if the motion is denied; [and] (4) any other unusual circumstances." *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). "The test for timeliness is essentially one of reasonableness: 'potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly.'" *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) (quoting *Nissei Sangyo America, Ltd. v. United States*, 31 F.3d 435, 438 (7th Cir. 1994)). We further note that, when intervention of right is sought, because "the would-be intervenor may be seriously harmed if intervention is denied, courts should be reluctant to dismiss such a request for intervention as untimely, even though they might deny the request if the intervention were merely permissive." 7C Charles Alan Wright et al., *Federal Practice & Procedure: Civil* § 1916 (3d ed. 2018). "We review the district court's decision on timeliness for an abuse of discretion." *Reich*, 64 F.3d at 321.

The first factor that we consider is the length of time the State knew or should have known of its interest in this case. "[W]e do not necessarily put potential intervenors on the clock at the moment the suit is filed or even at the time they learn of its existence. Rather, we determine timeliness from the time the potential intervenors learn that their interest might be impaired." *Id.* Indiana contends that its motion was timely because it moved to intervene as soon as it became aware of the Stipulated Judgment, less than a month after the entry of judgment and within the time to file an appeal. It maintains that it was unaware of this case or the Stipulated Judgment until after the district court entered final judgment.

In considering this first factor, we, like our sister circuits, give significant weight to the fact that the motion to intervene was filed within the time limit for filing a notice of appeal.[20] Additionally, although the district court ultimately ruled that the motion to intervene was not timely, the court's earlier statements reflected another view. In finally denying the motion to intervene, the court remarked that the State should have known that it had an interest in the litigation five months earlier, when the parties proposed the Stipulated Judgment. The court also asserted that the State should have known of its interest in this case when, as early as July 12, 2017, Indiana media outlets published stories about this litigation and the parties' proposed agreement. By contrast, in granting the State's motion for extension of time to appeal, the court noted that "[e]ven with the exercise of due diligence, the State would not necessarily have had earlier notice of this lawsuit and [the district court's] entry of final judgment."[21] Indeed, the district court acknowledged, correctly, that "we know of no legal duty imposed on the State to track every lawsuit implicating an interpretation of Indiana law … and we have no reason to believe that the State had actual notice of this lawsuit" before filing its motion to intervene.[22] We think the latter remarks of the district court reflect a more accurate and realistic view of the entire record. The district court was correct in determining that the State

---

[20] *See, e.g., Ross v. Marshall*, 426 F.3d 745, 755 (5th Cir. 2005); *Triax Co. v. TRW, Inc.*, 724 F.2d 1224, 1229 (6th Cir. 1984).

[21] R.58 at 3.

[22] *Id.* at 4.

cannot be faulted for not learning of this suit sooner. The State received no notification of the initiation of this litigation, and the Attorney General of Indiana had no obligation to monitor the local news services to determine from their reports whether the State had a sufficient interest to justify entering the litigation.[23]

Of course, the "most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for intervention will prejudice the existing parties to the case." *Nissei Sangyo America, Ltd. v. United States*, 31 F.3d 435, 439 (7th Cir. 1994) (quoting 7C Charles Alan Wright et al., *Federal Practice & Procedure: Civil* § 1916 (2d ed. 1986)). Where a stipulated judgment is involved, intervention can prejudice the original parties because the judgment cannot be approved without the intervenor's agreement and because the implementation of its terms will "necessarily be delayed." *City of Bloomington*, 824 F.2d at 536.

The district court determined that the prejudice to the original parties would be "real and appreciable" because the personal-capacity defendants had been dismissed with prejudice and their repose would be disturbed.[24] The offi-

---

[23] *Cf. Atl. Mut. Ins. Co. v. Nw. Airlines, Inc.*, 24 F.3d 958, 961 (7th Cir. 1994) (noting that, "[u]ntil the district judge issued his opinion," the intervenor "could not have known that this otherwise-mundane case included an issue affecting international relations"); *Peruta v. Cty. of San Diego*, 824 F.3d 919, 940 (9th Cir. 2016) (en banc) (granting the State of California's motion to intervene after a panel of the Ninth Circuit had issued its decision because the State "had no strong incentive to seek intervention … at an earlier stage, for it had little reason to anticipate … the breadth of the panel's holding").

[24] R.62 at 14.

cial-capacity defendants had obtained the district court's determination of their obligations, and Mr. Lopez-Aguilar's vindication of his position would be "wholly overthrown" by reopening the litigation.[25]

As a practical matter, however, none of these suggested difficulties can be said to be a result of the State's "delay" in moving to intervene. Even if the State moved to intervene in July 2017, after the parties proposed the Stipulated Judgment, rather than in December 2017, after the State learned that the district court had entered final judgment, the burden to the parties of reopening the litigation and resuming settlement negotiations would have been the same. *Cf. Nissei Sangyo America*, 31 F.3d at 439 (concluding that the intervenor's "delay" did not cause the type of prejudice advanced by the plaintiff, since the plaintiff "would have been burdened in precisely the same manner had [the movant's] motion to intervene been filed in July rather than October"). Any prejudice to Mr. Lopez-Aguilar and the defendants is not "so great as to justify denying" the State's motion to intervene. *Reich*, 64 F.3d at 322.

We also must consider "the prejudice to the intervenor if the motion is denied." *Sokaogon Chippewa Cmty.*, 214 F.3d at 949. For example, we determined in *Reich* that the prejudice to a group of exotic dancers who wished to intervene in a Fair Labor Standards Act suit brought against their employer by the Secretary of Labor was significant and outweighed any prejudice to the existing parties. *Reich*, 64 F.3d at 322. Absent intervention, the dancers would have been denied

---

[25] *Id.*

"their one and only opportunity to define their employment status" with the defendant. *Id.*

Here, the district court took the view that the prejudice to the State "would be minimal or nonexistent" because its order "binds only the original parties to this action" and because the State "has numerous courts, state and federal, and numerous potential cases, open to it for the vindication of its preferred legal position."[26] We cannot accept this view. The district court's entry of a *permanent* injunction hobbles, substantially, Indiana's ability to implement its legislative policy in its most populous county. Nor is this a case where the State previously had the opportunity, but elected not, to provide its input on the terms of the Stipulated Judgment. *Cf. City of Bloomington*, 824 F.2d at 537 (noting that the proposed intervenor had "submitted its comments to the Justice Department, and its views were presumably considered by the district court prior to the final entry of the consent decree," such that "it would suffer little prejudice if it were denied permission to intervene"). Rather, the district court approved and entered the Stipulated Judgment without any adversarial briefing on the enforceability of the relevant Indiana code provisions, let alone any input from the State. The prejudice to the State from being denied the opportunity to explain portions of its legal code is "significant" and "outweighs any prejudice" to the existing parties. *Reich*, 64 F.3d at 322.

A state's right to participate in federal litigation implicating its interests as a sovereign is a serious matter. *Cf.* 28

---

[26] *Id.* at 15.

U.S.C. § 2403(b) (requiring a district court to notify a state's attorney general and permit the state to intervene whenever the constitutionality of a state statute is at stake); Fed. R. Civ. P. 5.1 (permitting the state attorney general to intervene when a party files a paper "drawing into question the constitutionality" of a state statute).[27] Moreover, the impairment of a substantive state legislative policy that directly implicates federal-state cooperation is surely a matter requiring great sensitivity on the part of the federal courts. If the State cannot intervene, then the district court's judgment will stand without adversarial briefing on the question of the enforceability of the Indiana code provisions designed to promote such cooperation.

In sum, because the State filed its motion to intervene within the time for filing an appeal, because the State cannot be faulted for not having intervened earlier, and because the prejudice to the State from being denied intervenor status outweighs any prejudice to the parties from allowing intervention, its motion to intervene was timely.[28] The district

---

[27] Indiana does not argue that 28 U.S.C. § 2403(b) is directly applicable in this case, nor is the operation of that statute clear where federal preemption of state law is the operative issue. For those reasons, we will pretermit any reliance upon it.

[28] The fourth factor we may consider is whether there are "any other unusual circumstances" bearing on the timeliness inquiry. *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). The district court ruled that "the State has pointed us to no such circumstances, and we perceive none." R.62 at 15. In its brief on appeal, the State has raised no argument regarding any unusual circumstances. *Cf.* Appellant's Br. 23–27. Therefore, our analysis does not include this factor.

court exceeded the bounds of permissible discretion in reaching a contrary conclusion.

**2.**

We now turn to examine whether the State satisfied the remaining conditions for seeking intervention. A non-party who wishes to intervene as of right must satisfy three requirements under Rule 24(a):

> (1) [T]he applicant must claim an interest relating to the property or transaction which is the subject of the action,
> (2) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, and
> (3) existing parties must not be adequate representatives of the applicant's interest.

*Sokaogon Chippewa Cmty.*, 214 F.3d at 945–46.

We first consider whether Indiana has a legally protectable interest in this litigation. "Our cases say that the prospective intervenor's interest must be direct, significant, and legally protectable." *Solid Waste Agency of N. Cook Cty. v. United States Army Corps of Eng'rs*, 101 F.3d 503, 506 (7th Cir. 1996). The Rule does not define "interest," but "the case law makes clear that more than the minimum Article III interest is required." *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009). At the same time, we have interpreted "statements of the Supreme Court as encouraging liberality in the definition of an interest." *Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 204 (7th Cir. 1982). In general, "[w]hether an applicant has an interest sufficient to warrant

intervention as a matter of right is a highly fact-specific determination, making comparison to other cases of limited value." *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995).

In this case, the State has a *fundamental* interest in the maintenance of its legislatively mandated policy to cooperate fully with the federal government in the enforcement of immigration laws. It is certainly within the State's exclusive purview to establish its expectations of the law enforcement officers operating under its statutes. Indiana has an interest in giving effect to its legislature's determination that the State ought to cooperate fully with federal immigration enforcement. Because the State has a substantial interest in overturning a federal injunction that limits its ability to effectuate its legislature's expectations, it has a "direct, significant, and legally protectable" interest in this litigation. *Solid Waste Agency*, 101 F.3d at 506.[29]

---

[29] The Supreme Court's decision in *Arizona v. United States*, 567 U.S. 387 (2012), does not diminish the State's asserted interest in this litigation. In *Arizona*, the Court held that the Immigration and Nationality Act ("INA") preempted an Arizona statute authorizing state officers, acting without a warrant, to detain any person if the officer had probable cause to believe that person committed an offense that made him removable from the United States. *Id.* at 410. The Court observed that federal law "instructs when it is appropriate to arrest an alien during the removal process." *Id.* at 407. By "attempt[ing] to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress ha[d] given to trained federal immigration officers," the Arizona statute conflicted with the federal scheme. *Id.* at 408. In defense of the statute, Arizona referenced 8 U.S.C. § 1357(g)(10)(B), which authorizes state officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present

(continued … )

Next, we examine whether the Stipulated Judgment "may as a practical matter impair or impede" the State's "ability to protect its interest." Fed. R. Civ. P. 24(a)(2). We have recognized that "concern with the stare decisis effect of a decision can be a ground for intervention." *Flying J*, 578 F.3d at 573. We also have observed that requiring a would-be intervenor to assert his interest in a separate suit can amount to an "impediment" justifying intervention as of right. *Id.* In *Flying J*, for example, we held that the interest of retailers who wished to limit price competition "would be directly rather than remotely harmed by invalidation" of a statute regulating unfair sales because the retailers "would lose much or even all of their business to their larger, more efficient competitors." *Id.* at 572. Because the retailers sought only "an opportunity to litigate an appeal," we concluded that requiring the retailers to "start over" by bringing a sepa-

---

( … continued)

in the United States." But, according to the Court, "no coherent understanding" of the word "cooperation" would include "the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. By contrast, the Indiana statutes at issue here only require that state and local officers cooperate with federal immigration efforts. *See* Ind. Code § 5-2-18.2-3 (prohibiting a governmental body from implementing a policy that "prohibits or in any way restricts" law enforcement officers from taking covered actions "with regard to information of the citizenship or immigration status" of a person, such as "[c]ommunicating or cooperating with federal officials"); *id.* § 5-2-18.2-4 (prohibiting a governmental body from "limit[ing] or restrict[ing] the enforcement of federal immigration laws to less than the full extent permitted by federal law"). Indiana law does not contemplate the kind of unilateral action by state officers that the *Arizona* Court determined violated federal law.

rate suit was an "impediment" that could be removed, without prejudice to the parties, "by allowing intervention." *Id.* at 573.

Here, the Stipulated Judgment will impair directly the State's ability to protect its substantial interest in cooperating with federal immigration enforcement efforts. The terms of the injunction oblige the Sheriff's Department of Indiana's most populous county to disregard, in a significant way, what the State believes is a legislative command to cooperate with the federal government. Absent intervention, the State will have no opportunity to assert its interest before the parties are bound by the terms of the Stipulated Judgment. *See Solid Waste Agency*, 101 F.3d at 507 (observing that "[t]he strongest case for intervention" is "where the intervenor-aspirant has no claim against the defendant yet a legally protected interest that could be impaired by the suit").

Lastly, we examine whether the existing parties adequately represent Indiana's interest. We presume adequacy of representation "[w]here the interests of the original party and of the intervenor are identical—where in other words there is no conflict of interest." *Id.* at 508. Here, by contrast, none of the original parties, who jointly requested entry of the Stipulated Judgment and did not seek an appeal, share the State's interest in defending the enforceability of the contested state statutes. Neither Mr. Lopez-Aguilar nor the defendants contend that any existing party adequately represents any interest the State may have in this case.

Because the State has demonstrated a direct, significant, and legally protectable interest in this litigation, which will be impaired absent intervention and is not adequately represented by the existing parties, the State is entitled to inter-

vention as of right. The district court therefore erred when it denied the State's motion.[30]

## C.

Having determined that the district court should have permitted Indiana to intervene for purposes of taking an appeal, we turn now to consider the State's position. In Indiana's view, "[t]he district court lacked Article III jurisdiction to declare unlawful and permanently enjoin Marion County's detention of removable aliens."[31] More specifically, Indiana submits that, because Mr. Lopez-Aguilar alleged only a single past incident of unlawful conduct—his detention in September 2014, at an ICE officer's request—his claim of past injury does not constitute in itself the real and immediate threat of injury necessary to make out a case or controversy.

We evaluate this contention by focusing on the Supreme Court's decision in *Lyons*. In that case, Lyons sued the City of Los Angeles and four of its police officers, alleging that the officers had stopped him for a traffic violation and, without provocation or legal justification, seized him and applied a "chokehold." 461 U.S. at 97. He sought damages, a declaratory judgment, and an injunction against the City barring the use of chokeholds. *Id.* at 98. The Supreme Court reversed the district court's entry of a preliminary injunc-

---

[30] Because Indiana clearly satisfies the criteria for intervention as of right under Rule 24(a), we need not examine in-depth whether it fulfills the requirements for permissive intervention under Rule 24(b).

[31] Appellant's Br. 33.

tion. It held that "the federal courts [were] without jurisdiction to entertain Lyons' claim for injunctive relief." *Id.* at 101.

The Court began its analysis with the premise that "those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *Id.* Specifically, "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Id.* at 101–02 (internal quotation marks omitted). That "injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Id.* at 102 (internal quotation marks omitted). It followed that "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105.

Relying on its decisions in *O'Shea v. Littleton*, 414 U.S. 488 (1974), and *Rizzo v. Goode*, 423 U.S. 362 (1976), the Court concluded that Lyons "failed to demonstrate a case or controversy with the City that would justify the equitable relief sought." *Id.* In *O'Shea*, the Court had held that the plaintiffs' complaint that they had been subject to discriminatory enforcement of the criminal law "failed to satisfy the threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy." 414 U.S. at 493. The Court reasoned that, although some of the named plaintiffs had actually "suffered from the alleged unconstitutional practices," "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief[] … if unaccompanied by any continuing, present ad-

verse effects." *Id.* at 495–96. Further, even if the Court were to conclude that the complaint presented a case or controversy, the plaintiff class had failed "to establish the basic requisites of the issuance of equitable relief in these circumstances—the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *Id.* at 502.

Similarly, in *Rizzo*, the plaintiffs sought equitable intervention to remedy police officer mistreatment of minority citizens and Philadelphia residents. 423 U.S. at 366–67. Because the plaintiffs' alleged injury rested on "what one of a small, unnamed minority of policemen might do to them in the future," the Court concluded that "[t]his hypothesis [was] even more attenuated than those allegations of future injury found insufficient in *O'Shea* to warrant invocation of federal jurisdiction." *Id.* at 372.

Adhering to these principles, the Court in *Lyons* concluded that the plaintiff's complaint fell "far short of the allegations that would be necessary to establish a case or controversy." *Lyons*, 461 U.S. at 105. Although Lyons may have been illegally choked by the police on October 6, 1976, the Court observed that this single past incident did "nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* Given the "speculative nature" of his "claim of future injury," Lyons had failed to demonstrate a "likelihood of substantial and immediate irreparable injury," which is a "prerequisite of equitable relief." *Id.* at 111 (quoting *O'Shea*, 414 U.S. at 502). "Absent a sufficient likelihood that he

[would] again be wronged in a similar way," the Court explained, Lyons was "no more entitled to an injunction than any other citizen of Los Angeles." *Id.* Finally, the Court stressed that "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws" absent "irreparable injury which is both great and immediate." *Id.* at 112 (citing *O'Shea*, 414 U.S. at 499). Accordingly, Lyons lacked standing to seek the injunction requested.

*Lyons* establishes that a plaintiff cannot seek an injunction "absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Id.* at 111. We consistently have understood *Lyons* to foreclose claims for equitable relief based on lack of standing where "the possibility" that the plaintiff "would suffer any injury as a result of" the challenged practice was "too speculative." *Robinson v. City of Chi.*, 868 F.2d 959, 966 (7th Cir. 1989) (affirming that there was "no reasonable likelihood" that plaintiff's claims would recur because he had "not alleged and ha[d] not shown that he [was] in immediate danger of again being directly injured" by a "post-arrest detention for investigation prior to a probable cause hearing"); *see also Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004) (concluding that, after Indianapolis police officers arrested plaintiff for possessing marijuana and conducted a body-cavity search for drugs before releasing him, the district court could not enjoin this practice because, "[u]nless the same events [were] likely to happen again *to him* there [was] no controversy between him and the City about the City's future handling of other arrests" (emphasis in original)); *Perry v. Sheahan*, 222

F.3d 309, 313 (7th Cir. 2000) (affirming plaintiff's lack of standing to seek injunction of county policy of seizing firearms during an eviction because Perry could not "demonstrate a realistic threat that he would be the subject of another forcible eviction in Cook County that would result in the seizure of his property"); *Knox v. McGinnis*, 998 F.2d 1405, 1413 (7th Cir. 1993) (denying Knox's claim for injunctive relief because "the mere possibility that Knox may sometime in the future be returned to the [prison] segregation unit [did] not establish a real and immediate case or controversy").

We recently applied *Lyons* in *Simic v. City of Chicago*, 851 F.3d 734 (7th Cir. 2017). In that case, a police officer issued Simic a ticket for violating Chicago's ordinance against texting while driving. *Id.* at 736. When the plaintiff failed to pay the ticket, the City took steps to collect a fine. *Id.* Simic then sued the City, claiming that the ordinance was unconstitutional and seeking to enjoin its enforcement. *Id.* at 736–37. On appeal, we determined that Simic did not have standing to seek injunctive relief. "Unlike with damages," we explained, "a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief." *Id.* at 738.

We determined that "Simic's claimed threat of future injury" was "conjectural" because it was entirely "contingent upon her once again driving while using her cell phone and receiving a citation under the Chicago ordinance." *Id.* "For purposes of standing to seek injunctive relief against future harm," we added, "courts generally assume that litigants 'will conduct their activities within the law and so avoid prosecution and conviction.'" *Id.* (quoting *O'Shea*, 414 U.S. at 497). Because Simic did "not have concrete plans to violate

Illinois law by using her cell phone while driving in Chicago," she lacked standing to seek injunctive relief. *Id.*

Applying *Lyons* to the case at hand, Mr. Lopez-Aguilar has failed to establish a case or controversy with the defendants "that would justify the equitable relief sought." *Lyons*, 461 U.S. at 105. Mr. Lopez-Aguilar's complaint identified as the source of his injury a single, isolated incident, on September 18, 2014, when a Marion County officer, at the request of an ICE officer, arrested and held him without probable cause. He did not allege any subsequent contact with the Sheriff's Department or the individual defendants, let alone any subsequent detentions in Marion County. That Mr. Lopez-Aguilar does not reside in Marion County makes a subsequent encounter with the Sheriff's Department and detention at the request of ICE all the more speculative. Therefore, "the odds" that Mr. Lopez-Aguilar will return to Marion County, again commit a traffic violation or other infraction resulting in an encounter with the Sheriff's Department, and again be detained at ICE's request are not "sufficient to make out a federal case for equitable relief." *Lyons*, 461 U.S. at 108 (internal quotation marks omitted). Absent "continuing, present adverse effects," Mr. Lopez-Aguilar's "[p]ast exposure to illegal conduct" by the defendants does not amount to a "present case or controversy" for equitable relief. *O'Shea*, 414 U.S. at 495–96.

Mr. Lopez-Aguilar simply fails to demonstrate a "likelihood of substantial and immediate irreparable injury," a prerequisite for equitable relief. *Lyons*, 461 U.S. at 111 (quoting *O'Shea*, 414 U.S. at 502). Without a "showing of any real or immediate threat that the plaintiff will be wronged again," *id.*, Mr. Lopez-Aguilar lacked standing to request,

and the district court lacked jurisdiction to award, the declaratory judgment and permanent injunction set forth in the Stipulated Judgment.

Mr. Lopez-Aguilar is notably reticent about countering forthrightly the State's argument that, under *Lyons*, he lacked standing to seek (and the district court lacked jurisdiction to award) injunctive relief. Instead, he maintains that the State ignores the line of cases holding that parties can agree through consent decrees to more relief than a court could have ordered absent settlement and more than the Constitution itself requires.[32] This argument over-reads significantly the governing case law. The requirement that the plaintiff must have standing to seek equitable relief does not cease when the parties agree to such relief by stipulated judgment. Although "[c]onsent decrees often embody outcomes that reach beyond basic constitutional protections," to be "enforceable as a judicial decree," a consent decree is "subject to the rules generally applicable to other judgments and decrees." *Kindred v. Duckworth*, 9 F.3d 638, 641 (7th Cir. 1993). The district court cannot "suspend the application of Article III" and the parties cannot "stipulate to the enlargement of federal jurisdiction" by means of a consent decree.

---

[32] One of the cases on which Mr. Lopez-Aguilar relies is *Local No. 93, International Association of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986). Although the Court in *Local No. 93* concluded that parties may agree to, and courts may enter, a consent decree that includes terms beyond the remedies provided in a specific *statute*, the Court never suggested that a court may enter a consent decree that includes a remedy beyond the court's *jurisdiction*. Indeed, the Court noted that "a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction." *Id*. at 525.

*United States v. ACCRA PAC, Inc.*, 173 F.3d 630, 633 (7th Cir. 1999). Even when the parties resolve the plaintiff's claims by agreement, therefore, the district court must consider whether it has jurisdiction to award the relief requested.

For instance, in *Blair v. Shanahan*, 38 F.3d 1514 (9th Cir. 1994), the court determined that the plaintiff lacked standing to seek a declaratory judgment that a California statute criminalizing aggressive panhandling was unconstitutional. In the district court, the City of San Francisco had made an offer of judgment under which it would accept a declaratory judgment in favor of the plaintiff. *Id.* at 1517. After the district court approved the consent judgment, the City moved to modify or vacate the judgment. The district court denied that motion, and the City appealed. *Id.* at 1518. The Ninth Circuit reversed, holding that the plaintiff lacked standing to seek declaratory relief because "it [was] unlikely that he [would] ever again desire to panhandle." *Id.* at 1519. Relying on *Lyons*, the court observed that, "in the context of Blair's request for declaratory or injunctive relief, '[p]ast exposure to illegal conduct does not itself show a present case or controversy … if unaccompanied by any continuing, present adverse effects.'" *Id.* (quoting *Lyons*, 461 U.S. at 102). Thus, "Blair's lack of a personal stake in the declaratory judgment" left the court "without jurisdiction to review the district court's order" declaring the statute unconstitutional. *Id.* at 1520.[33]

---

[33] Similarly, in *Ducharme v. Rhode Island*, No. 93-1675, 1994 WL 390144 (1st Cir. July 15, 1994) (unpublished), the court concluded that "Ducharme's claims for equitable relief [did] not fall within the subject matter jurisdiction of the federal courts." *Id.* at *3. The Rhode Island State

(continued … )

The parties' agreement to resolve Mr. Lopez-Aguilar's claims by stipulated judgment did not relieve the district court of its obligation to confirm that it had Article III jurisdiction to enter the declaratory judgment and permanent injunction. *Lyons* operates with the same force and effect in this context and compels the conclusion that Mr. Lopez-Aguilar did not have standing to request equitable relief. The Supreme Court has admonished that, absent "great and immediate" irreparable injury, "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers

---

( … continued)

Police had arrested Ducharme for disorderly conduct, taken him to a police building, and strip searched him before placing him in a holding cell. *Id.* at *1. Ducharme brought a claim under 42 U.S.C. § 1983 against the State Police and the police officer who searched him, alleging that the strip search violated his rights under the Fourth and Fourteenth Amendments. *Id.* The parties negotiated a consent judgment, by which the defendants agreed to pay Ducharme damages and to refrain from performing strip searches of arrestees charged with misdemeanors or motor vehicle offenses. *Id.* at *2. The district court denied Ducharme's motion for entry of the consent judgment, and the First Circuit affirmed. Acknowledging that "Ducharme clearly ha[d] standing to bring an action for damages against the defendants based on the … strip search," the court held that "[i]t [was] equally obvious that Ducharme ha[d] no standing to request equitable relief." *Id.* at *3. The court "simply" could not "assume that Ducharme [would] violate the law in the future in a manner that would lead the State Police to arrest him and place him in a holding cell." *Id.* Accordingly, "[i]n the absence of a case or controversy with respect to Ducharme's claim for equitable relief, *Lyons* teaches that neither we nor the district court have jurisdiction to consider the merits of an equitable decree." *Id.* The court perceived no "reason why the outcome of the jurisdictional inquiry should turn on whether the decree is the product of a pre-trial consent judgment or a post-trial order." *Id.*

engaged in the administration of the States' criminal laws."
*Lyons*, 461 U.S. at 112; *see also O'Shea*, 414 U.S. at 499. There-
fore, the district court erred when it entered the Stipulated
Judgment without regard to Mr. Lopez-Aguilar's standing to
seek equitable relief.[34]

---

[34] Mr. Lopez-Aguilar relies on *O'Sullivan v. City of Chicago*, 396 F.3d 843
(7th Cir. 2005), for the proposition that, although "Article III standing
might not have supported injunctive relief (or any relief) at the time the
decree was entered," that "did not cast doubt on the district court's abil-
ity to enter the decree when the case was properly within its sub-
ject-matter jurisdiction." Lopez-Aguilar Br. 47. *O'Sullivan*, however, ad-
dressed a different, and unique, situation. In *O'Sullivan*, the original con-
sent decree was entered in 1972 and modified twice after that date.
*O'Sullivan*, 396 F.3d at 848, 851. Approximately fifteen years after the last
modification of the consent decree, the plaintiffs brought an enforcement
action. *Id.* at 851. In response, the defendants maintained that the plain-
tiffs lacked standing to enforce the decree. *Id.* After reviewing the convo-
luted history of the litigation, the court made a few notable observations.
First, "[a]fter a case has become final by exhaustion of all appellate rem-
edies, only an egregious want of jurisdiction will allow the judgment to
be undone by someone who, having participated in the case, cannot
complain that his rights were infringed without his knowledge." *Id.* at
859 (quoting *In re Factor VIII*, 159 F.3d 1016, 1019 (7th Cir. 1998)). We de-
termined that there was not "an egregious want of jurisdiction" when
the district court originally entered the consent decree. *Id.* at 866. Rather,
there had been significant changes in the Supreme Court's approach to
subject-matter jurisdiction since entry of the decree. *Id.* at 866–67. Fur-
ther, we observed that when enforcing a consent decree that included
"an injunction restricting the ability of a State or local government to
meet its responsibilities," "there is a need to ensure that changes in fac-
tual or legal circumstances do not transform a once-just result into one
that is unjust, illegal or overly burdensome and do not unnecessarily
hinder a State in providing for the welfare of its citizenry." *Id*. at 865.
Given these circumstances, the proper action of the governmental de-

(continued … )

## Conclusion

For the foregoing reasons, we reverse the judgment of the district court and remand for proceedings consistent with this opinion. Indiana may recover its costs in this court.

REVERSED AND REMANDED

---

( … continued)

fendant is not to ignore or defy the decree, but to seek a modification of the decree based on the change in law. *Id.* at 868. We therefore remanded the case to the district court, inviting the governmental defendants to seek a modification of the decree under Rule 60(b). *Id.*

The differences between our situation and the one in *O'Sullivan* are stark. There is no suggestion that, because of changes in the law, the district court initially had jurisdiction to award injunctive relief when the parties entered the Stipulated Judgment but has since lost such jurisdiction. At no point in this litigation did Mr. Lopez-Aguilar have standing to seek the prospective injunctive relief awarded by the district court. Moreover, this case is before us on direct appeal; it has not "become final by exhaustion of all appellate remedies." *Id.* at 859. Nor is the State attempting to undo a judgment after it has had the opportunity to participate in a case and have its rights fairly determined. Rather, the State seeks in the first instance an opportunity to ensure that its laws can operate within its most populous county in the manner contemplated by the Indiana legislature.