In the

# United States Court of Appeals

### For the Seventh Circuit

No. 19-2116

ACCESS LIVING OF METROPOLITAN CHICAGO, *et al.*,

*Plaintiffs-Appellants*,

*v.*

UBER TECHNOLOGIES, INC., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-9690 — **Manish S. Shah**, *Judge*.

ARGUED DECEMBER 9, 2019 — DECIDED MAY 5, 2020

Before EASTERBROOK, ROVNER, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Whether the Americans with Disabilities Act's public accommodation provisions apply to ridesharing companies like Uber is unsettled. The lawsuit underlying this appeal presents that question and the many complexities that come with considering Uber's business model and the discrimination proscribed by the ADA. Before us are antecedent questions about whether certain plaintiffs—

a disability rights advocacy organization called Access Living
as well as an individual named Rahnee Patrick—have alleged
injuries sufficient to show Article III standing and to state
causes of action under § 12188(a)(1) of Title III of the ADA.
The district court answered no for both plaintiffs. We affirm.

## I

### A

Uber operates ridesharing applications that connect cus-
tomers seeking private transportation with providers of those
services. Founded in 2009, the company has experienced ex-
plosive growth, going public in 2019 and reporting annual
consolidated revenue of $14.1 billion. For many today, "call-
ing an Uber," as the lingo goes, has become commonplace and
preferred over traditional taxi services.

Though Uber does not own or select their drivers' vehi-
cles, its app presents riders with options. Many will choose
standard sedans, premium cars, or SUVs. Others, however,
may need a specialized vehicle. Customers restricted to mo-
torized wheelchairs need wheelchair accessible vehicles, or
WAVs—vehicles equipped with ramps and lifts. Uber's app
offers that option as well.

Access Living is a Chicago-based nonprofit organization
formed to protect and advance the civil rights of people with
disabilities, including by helping them live independently.
Fourteen percent of the organization's staff and 20 percent of
its board members are wheelchair users who require a WAV.
Access Living and three of its staff members or volunteers,
Michelle Garcia, Justin Cooper, and Rahnee Patrick, brought
this lawsuit in October 2016. The individual plaintiffs would
like to use Uber to order WAVs for rides to meetings and

advocacy events in Chicago. Access Living reimburses its employees for these business-related travel costs and, in furtherance of its broader mission, promotes access to equivalent travel services for all individuals who use motorized wheelchairs.

The Americans with Disabilities Act prohibits discrimination based on disability in "major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). The plaintiffs brought their claim under Title III, which defines a "public accommodation" to include a "travel service." 42 U.S.C. § 12181(7)(F). They allege that Uber, as a travel service and thus public accommodation, discriminates against people with disabilities by failing to ensure equal access to WAVs for motorized wheelchair users. This disparity occurs, the plaintiffs contend, because Uber fails to ensure the availability of enough drivers with WAVs, instead outsourcing most requests for wheelchair accessible rides to local taxi companies. As a result, plaintiffs say, motorized wheelchair users experience longer wait times and higher prices than other Uber customers.

Access Living and the individual plaintiffs seek injunctive relief and a declaration that Title III of the ADA requires Uber to provide equivalent services to customers requiring a WAV. For its part, Uber contends that its ridesharing technology—being altogether different from a physical structure like an office building, hotel, or restaurant—is not a "public accommodation" within the meaning of Title III and thus is not subject to any equal access mandate imposed by the ADA.

B

No circuit court has addressed whether the ADA's Title III public accommodation provisions apply to companies operating ridesharing technology, to say nothing of Uber's alleged violation of the statute. This appeal does not require us to be the first. The question presented is more limited: whether Access Living as an organization and Rahnee Patrick as an individual have alleged facts to establish Article III standing and to state a cause of action under Title III of the ADA. The district court held that the other two individual plaintiffs, Michelle Garcia and Justin Cooper, have stated claims, and no aspect of this appeal challenges that decision. Indeed, both of those plaintiffs later settled with Uber.

In a December 2018 order and opinion, the district court granted Uber's motion to dismiss Access Living and Rahnee Patrick as plaintiffs. See *Access Living of Metro. Chicago v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141, 1159 (N.D. Ill. 2018). The court concluded that Patrick did not plead the requisite injury-in-fact for Article III standing and Access Living failed to allege facts to state a cause of action under § 12188(a)(1) of Title III of the ADA. See *id.* at 1150, 1153–54. In a subsequent order entered in April 2019, the court denied requests from Patrick and Access Living to amend their complaint, concluding that any amendment would be futile in light of the specific allegations they proposed adding to the case. The court likewise denied a request by both plaintiffs to expand the scope of the complaint to cover ridesharing requests beyond the City of Chicago to include suburban communities. The district court saw this proposed amendment as coming too late in the litigation—on the eve of discovery closing—to be permitted.

Access Living and Patrick now appeal the district court's final decision denying them leave to amend.

**II**

A

Access Living is a nonprofit organization that coordinates services and programs and advocates for people with disabilities. As a "center for independent living," the organization receives federal funding under the Rehabilitation Act of 1973. See 29 U.S.C. § 796. Like other centers, Access Living supports people with disabilities by providing "core services," such as training on independent living skills. *Id*. § 705(17)(B). The organization also broadly promotes "equal access" for those with disabilities "to all services, programs, activities, resources, and facilities." *Id*. § 796f-4(b)(1)(D).

Access Living's advocacy efforts extend to transportation services. In 2012 the organization successfully campaigned for a Chicago ordinance requiring more wheelchair accessible taxis. It has since turned its attention to ridesharing companies like Uber, which it alleges are "now a significant part of our national transportation system and are positioning themselves to be an indispensable part of the transportation systems of the future." In 2016 Access Living advocated for an amendment to a Chicago ordinance to require ridesharing companies to provide equivalent services for wheelchair users. While the effort failed before the City Council, Access Living continues to press for change, including through litigation.

B

To proceed in federal court, Access Living—like all plaintiffs—must first establish Article III standing. To do so, the

organization must allege that it suffered a concrete and particularized injury traceable to Uber and capable of being redressed through a favorable ruling. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); see also *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 384–85 (7th Cir. 2019). Put another way, to determine whether Access Living has standing "we conduct the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (internal quotations omitted).

The Supreme Court's decision in *Haven's Realty* provides important guidance. A nonprofit organization dedicated to ensuring open housing brought claims under the Fair Housing Act alleging injury on the basis of having expended significant resources investigating and reporting racially discriminatory housing practices by a realty company in a suburb of Richmond, Virginia. See *id.* at 369. The organization contended that the company's practice of steering apartments on the basis of race hindered its efforts to assist prospective tenants in realizing equal access to housing. See *id.* at 379. The Court concluded that these allegations sufficed to establish Article III standing, for "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*; see also *Common Cause Indiana v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) (applying *Haven's Realty* and holding that a voter advocacy organization had standing to challenge an election law because it would create an unwanted demand on its resources "to alleviate potential harmful effects" of the

law, which "[would] displace other projects [it] normally undertake[s]").

Access Living has Article III standing here. In clear and precise terms, the organization alleged that it experiences increased transportation costs as a result of Uber's provision of ridesharing services on unequal terms to persons requiring WAVs. By way of example, Access Living alleged that the unequal access has prevented its volunteers and staff from attending meetings with lawmakers and local transportation boards because getting there would have been too costly. And these increased costs, Access Living adds, force the organization to divert resources to counter this discrimination that it could otherwise use to fulfill its disability rights mission.

All of this is enough to demonstrate a concrete and particularized injury for standing purposes. The organization roots its allegations not in a generalized appeal to its mission, but in specific contentions about incurring increased costs as a result of Uber's alleged provision of WAVs on terms unequal to its other rideshare offerings. Article III requires no more.

## C

The question then becomes whether Access Living has stated a cause of action under Title III of the ADA. See *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (recognizing the distinction between standing under Article III of the Constitution and whether, as a statutory matter, the plaintiff has stated a cause of action within the meaning of a provision in the U.S. Code). Principles of statutory construction guide the inquiry. See *Citizens for a Better Env't v. Steel Co.*, 230 F.3d 923, 928 (7th Cir. 2000) (explaining that whether there is a cause of action

"is a matter of statutory meaning, not of power to adjudicate").

Access Living sued Uber under Title III of the ADA, which prohibits public accommodations, including travel services, from discriminating on the basis of disability. See 42 U.S.C. § 12182(a). Congress authorized private enforcement of Title III by "any person who is being *subjected to* discrimination on the basis of disability in violation" of that Title. *Id*. § 12188(a)(1) (emphasis added). So the question is whether Access Living is "subjected to" discrimination by Uber's provision of allegedly unequal services to members of the organization's staff and volunteer corps who wish to order WAVs for work-related travel.

Access Living relies on the same reasons supporting its Article III standing—Uber's furnishing of unequal access to WAVs, which results in the organization incurring increased transportation costs—to argue that it has been "subjected to" discrimination. The district court disagreed. It concluded that Access Living failed to allege in direct enough terms that the organization itself was "subjected to" discrimination, but rather only that its injuries derived from harm experienced in the first instance by its employees and volunteers. The district court saw the same pleading deficiency in Access Living's proposed amended complaint, as the allegations there, while advanced in more detail, still only alleged secondhand injury to the organization.

We review denials of leave to amend for abuse of discretion but evaluate the underlying legal basis for futility *de novo*. See *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 524 (7th Cir. 2015). And our inquiry begins, as it must, with the language Congress employed in

§ 12188(a)(1) to authorize private party lawsuits under Title III. See *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 888 (7th Cir. 1996) (explaining that in interpreting the scope of a cause of action "we begin with the plain language of the statute we are called upon to apply").

The district court was right to read § 12188(a)(1) and Congress's limiting a cause of action to "any person who is being subjected to discrimination on the basis of disability" as requiring a direct connection between Uber's alleged discrimination and the injury complained of by Access Living. As a verb, to "subject" means "[t]o bring under the operation of an agent, agency, or process; to submit to certain treatment; to cause to undergo or experience something physically." *Subject*, OXFORD ENGLISH DICTIONARY ONLINE, https://www.oed.com/view/Entry/192688 (last visited May 5, 2020). Congress employed "subjected to" the same way in § 12188(a)(1): the language requires the would-be plaintiff to directly experience the challenged discrimination. The "subjected to" formulation narrows the pool of possible plaintiffs in a way that eliminates someone alleging only indirect injury experienced derivatively or vicariously through another.

Our construction of § 12188(a)(1) finds reinforcement in other provisions of Title III. See *C.I.R. v. Engle*, 464 U.S. 206, 223 (1984) (noting that "the true meaning of a single section of a statute . . . , however precise its language, cannot be ascertained if it be considered apart from related sections"). Title III as a whole prohibits discrimination "on the basis of disability in the full and equal enjoyment . . . of any place of public accommodation," 42 U.S.C. § 12182(a), and therefore "requires places of public accommodation and commercial facilities to be designed, constructed, and altered in compliance

with the accessibility standards established by [regulations]." 28 C.F.R. § 36.101(a). Places of public accommodation include businesses open to the public (hotels and restaurants, for example). See 42 U.S.C. § 12181(7).

Within Title III Congress not only authorized private enforcement through civil actions, but also proscribed particular acts and types of discrimination. Consider foremost § 12182, Title III's discrimination-by-association provision, which states that it "shall be discriminatory" to "deny" equal services "to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." *Id*. § 12182(b)(1)(E). Reading this substantive prohibition together with § 12188(a)(1) reinforces our conclusion that Congress intended private enforcement of Title III to hinge upon a showing of direct injury. Put most simply, an entity denied equal services because of its association with someone who has a disability experiences direct harm—is "subjected to" discrimination—and therefore can invoke § 12188(a)(1) to enforce the substantive prohibition embodied in § 12182(b)(1)(E).

The statute's implementing regulations illustrate the point even more concretely. By way of example, the regulations provide that "it would be a violation of [Title III] for a day care center to refuse admission to a child because his or her brother has HIV disease." 28 C.F.R. pt. 36, app. C § 36.205; accord *Special Educ. Servs. v. Rreef Performance P'ship-I, L.P.*, No. 95 C 6468, 1995 WL 745964, at *3 (N.D. Ill. Dec. 11, 1995) (interpreting the same statutory language and observing that a school would, for example, have a cause of action if denied a lease renewal because it served children with disabilities).

The upshot is clear: § 12182(b)(1)(E)'s discrimination-by-association provision still requires the same direct discrimination (and thus direct injury) on which Congress hinged private enforcement of Title III in § 12188(a)(1). It is on this exact score that Access Living's effort to state a cause of action falls short. Nowhere, for instance, does Access Living allege that it maintains its own corporate Uber account and found itself unable—because it employs or associates with persons with disabilities—to order Uber rides for its staff, volunteers, or guests. To the contrary, the discrimination Access Living alleges falls entirely on the indirect side of the line, as it seeks to recover for discrimination experienced in the first instance by its staff or volunteers. The alleged harm to the organization comes only indirectly in the form of increased reimbursement costs. The district court was right to conclude that Access Living failed to state a cause of action in its original and proposed amended complaints.

This reasoning aligns with the Eleventh Circuit's decision in *McCullum v. Orlando Regional Healthcare System*, 768 F.3d 1135 (11th Cir. 2014). The district court there dismissed claims brought by parents against a hospital that allegedly failed to provide their deaf and mute son with a professional interpreter. See *id.* at 1138. The child's parents and sister (much like Access Living here) invoked § 12182(b)(1)(e) and sought to state a cause of action under Title III of the ADA, alleging that the hospital injured them by effectively leaving it to them to facilitate communication with their son, even though they had limited knowledge of sign language. See *id.* at 1142.

The Eleventh Circuit held that these allegations of injury were too indirect—the parents alleged discrimination against their son in the first instance and only against themselves as a

secondary matter, thereby failing to show they were "subjected to" discrimination within the meaning of § 12188(a)(1). See *id.* at 1143. The boy's parents and sister, as the court put it, failed to allege any "exclusion, denial of benefits, or discrimination that they themselves suffer[ed]." *Id.* They therefore failed—much like Access Living here—to state a cause of action under Title III of the ADA. See *id.*

Our conclusion finds additional reinforcement by comparing the language Congress used to define the causes of action in Titles II and III of the ADA. While Title II, which governs public entities, authorizes suit by "any person alleging discrimination on the basis of disability," 42 U.S.C. § 12133, Title III does so only for someone "subjected to discrimination." *Id.* § 12188(a)(1). The latter formulation—"subjected to discrimination"—is narrower than the former—"any person alleging discrimination." And we must presume the difference matters. See *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

We find it likely that Title II plaintiffs need only trace their alleged injury to any proscribed discrimination within that portion of the ADA. See *Innovative Health Sys., Inc., v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) (noting that the "broad language in [Title II's] enforcement provision evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III of the Constitution") (internal quotations omitted). But because Uber is a private entity, Access Living had to sue under Title III and therefore had to allege being "subjected to" discrimination,

which necessitates more. Access Living does not allege that the organization itself has been "subjected to" discrimination by Uber. Rather, by the terms of its original and proposed amended complaints, the organization's alleged harm follows only indirectly from injuries first experienced by others with disabilities. The district court therefore properly dismissed Access Living as a plaintiff and denied these amendments.

## III

### A

We now turn to the district court's dismissal of Rahnee Patrick as an individual plaintiff. According to her original complaint, Patrick serves as Access Living's Director of Independent Living Services. She uses a motorized wheelchair but "can often transfer into a standard vehicle." Her husband, too, uses a motorized wheelchair but always requires a WAV to travel. Patrick alleged that, while she has not downloaded Uber's app to her smartphone and opened an account, her husband had concluded from secondhand accounts and a screenshot of the app that he cannot rely on the company for regular and efficient access to WAVs. This unequal access to WAVs, Patrick continued, prevents her from using Uber to travel with her husband.

The district court dismissed Patrick from the original complaint. Unlike the other two individual plaintiffs, Michelle Garcia and Justin Cooper, the court concluded that Patrick's allegations rooted themselves not in any personal knowledge of Uber's services or experience with the company, but instead only stated information known to her husband. These allegations did not suffice to establish Article III standing because, as the district court reasoned, "it is not reasonable for

someone to be deterred [and injured] by conduct she never knew about." *Access Living*, 351 F. Supp. 3d at 1150 (citing *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (noting that ADA plaintiffs "must at least prove knowledge of the barriers")).

Patrick responded by seeking permission to amend her complaint. In her proposed amended complaint, she renewed many of her original allegations, including by stating that she is a "motorized wheelchair user who can sometimes, but not always, transfer to a standard vehicle," and from there adding that "she has paid and continues to pay significant attention to Uber's activities and travel services for people with disabilities," including by personally witnessing colleagues at Access Living experience long wait times upon ordering a WAV from Uber. She also renewed her desire to travel with her husband (to dinner and to visit the temple where they were married, for example), who always requires use of a WAV. So, too, did Patrick renew not only her acknowledgment that she "has not downloaded the app because Uber does not provide equivalent services to motorized wheelchair users like herself," but also her request for declaratory and injunctive relief.

The district court denied Patrick's request to amend her complaint. The court was quick to observe that Patrick had fixed her prior pleading shortcoming by advancing her proposed allegations in terms of her own personal knowledge of Uber's WAV offerings. But the district spotted a new pleading deficiency: "The problem now is that though Patrick uses a motorized wheelchair, she is 'sometimes, but not always' able to transfer to a standard vehicle," rendering her allegation of any injury too "speculative" because "Patrick is not injured

by a lack of accessible vehicles when she only needs one 'sometimes.'"

Patrick appeals, contending the allegations in her proposed amended complaint both as to herself and through her association with her husband are sufficient to establish standing and to state a cause of action under § 12188(a)(1) of the ADA.

B

We begin with Patrick's allegations that Uber's unequal access to WAVs has injured her because of her own disability and occasional need to use a WAV.

To establish Article III standing, an injury-in-fact must be "concrete and particularized," meaning it "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 & n.1. The alleged injury also must be "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Even more, a plaintiff like Patrick who seeks injunctive relief may do so only upon alleging a "real and immediate threat" of a future injury. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (internal quotations omitted); see also *Carello v. Aurora Policeman Credit Union*, 930 F.3d 830, 833 (7th Cir. 2019) (articulating the same standard). Allegations that convey but a "*possible* future injury are not sufficient," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (internal quotations omitted), because that makes any injury merely "conjectural or hypothetical." *Friends of the Earth*, 528 U.S. at 180.

Unlike the district court, we do not see Patrick's allegation that she "can sometimes, but not always, transfer to a standard vehicle" as fatal to her showing Article III injury. The

district court effectively focused on half of Patrick's allega-
tion, highlighting only those times she will not need a WAV.
At the pleading stage, though, we must take Patrick at her full
word: she has a disability, uses a motorized wheelchair, and
at times will need a WAV. That she cannot go further and
identify the exact dates on which she will need a WAV does
not render her allegation too speculative or indefinite to es-
tablish an injury. There is "at least a substantial risk that such
harm will occur." *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817
F.3d 1013, 1019 (7th Cir. 2016).

In her pursuit of injunctive relief, in no way has Patrick
alleged a future injury as speculative as the one we encoun-
tered in *Hummel*, where certain plaintiffs hinged a Title III
ADA claim focused on courthouse access to predictions about
the levels of future snowfalls and the anticipated insufficiency
of municipal snow removal efforts. See *id.* Patrick's ongoing,
albeit intermittent, need for a WAV is almost certain to coin-
cide with a day she would like to use Uber in her professional
or personal life. Unlike the plaintiffs in *Hummel* for whom
"[w]e could only speculate whether [their] cases will involve
court appearances on future snowy days," Patrick's alleged
injury is nowhere near that attenuated. *Id.*

While we disagree with the district court's reasoning, we
still reach the conclusion that Patrick has not alleged enough
to demonstrate Article III standing. What concerns us is that
Patrick, while adequately advancing that she will need at
times to travel in a WAV, has not tethered that contention in a
particularized way to Uber's alleged discrimination against
her. Recall that Patrick's Title III claim is that Uber fails to pro-
vide equivalent services—most especially equivalent re-
sponse times—to motorized wheelchair users requiring a

WAV. At that level of generality, the allegation is clear. But articulating a legal theory with clarity is not the same as advancing an allegation of imminent harm with the particularity—the individualization—demanded by Article III. See *Lujan*, 504 U.S. at 560 n.1; see also *Spokeo, Inc.*, 136 S. Ct. at 1548 (collecting other cases emphasizing the same point).

Patrick's proposed amended complaint lacks any allegation of an individualized experience with Uber. Indeed, Patrick admits she does not have an Uber account: she has never downloaded Uber's ridesharing app or submitted her credit card information. She has therefore never checked response times and price quotes on occasions where she needed to arrange private transportation, let alone actually ordered a WAV and experienced any unequal service firsthand. Having never taken these steps, Patrick is unable to point to any past injury or even articulate what future discrimination would look like as applied to her individual needs. She is without any personalized experience on which to rest her claim for injunctive relief based on Uber's failure to provide her with a WAV on equivalent terms of service.

Perhaps the outcome would be different if Patrick had alleged that Uber, as a categorical matter, refuses to offer its ridesharing service to users of motorized wheelchairs. See, *e.g.*, *Scherr*, 703 F.3d at 1071 (noting that the plaintiff's case was premised on the hotel's use of spring-hinged doors that allegedly violated the ADA). But that is not her contention, as she readily acknowledges Uber's WAV service offering. Her claim focuses instead on whether Uber provides WAVs on equivalent terms, and especially with equivalent response times, when compared with its standard rideshare offerings. Whether Patrick herself will be injured is necessarily an

individualized fact-intensive question and ultimately a matter of degree, requiring us to ensure that her complaint contains allegations sufficient to meet Article III's particularity requirement. We cannot get there.

Instead of advancing allegations in individualized terms, Patrick resorts to the broad observation that she "has paid attention to" Uber's service offerings to persons with disabilities, only then in other places to say that she has seen "images of Uber's app" (presumably on others' phones) showing an unavailability of WAVs at her home address while also learning from a colleague that "wait times for an UberWAV outside the Chicago Loop were so long that she sometimes took other forms of public transportation." From there Patrick's only other allegation is that she would like to travel for personal purposes with her husband, who always needs a WAV.

None of this suffices to allege an imminent injury with the particularity demanded by Article III's case or controversy requirement. Patrick's allegations are too reliant on open-ended generalizations or reports from others about Uber's WAV service offerings rather than on what she herself has experienced (or is likely to experience) in her own personalized way.

So what possibly is the explanation? Why would someone like Rahnee Patrick wishing to litigate an unsettled and important issue under the ADA fail to plead the individualized injury necessary to establish Article III standing? The answer, as best we can discern, comes from outside her proposed complaint and indeed from a concern that, had she downloaded the app, ordered a WAV, and then sought to bring this lawsuit, Uber would seek to compel arbitration, as reportedly required by its customer service agreement. Preferring federal court over arbitration, Patrick purposely avoided

downloading the app—or so Uber's hypothesis runs. That may be right, for Patrick seems to anticipate concerns about her standing by alleging in the proposed amended complaint that she "has not downloaded the app because Uber does not provide equivalent services to motorized wheelchair users like herself." We know from Patrick's briefs that what she means to say is that she alleged enough about Uber's practices to establish being reasonably deterred and excused from downloading the app, opening an account, and experiencing the discrimination and clear injury that would surely come from doing so.

It is not hard to imagine a circumstance where Patrick's reasoning would have considerable force. Take, for example, a modern commercial building with a flight of stairs leading to the entrance. Nobody would argue that a person restricted to a wheelchair would need to attempt to climb the stairs as part of bringing an ADA claim challenging the absence of any wheelchair ramp or elevator. It would be enough to plead personal knowledge of the absence of an alternative accessible entrance and the desire to enter. See *Scherr*, 703 F.3d at 1075 (noting that the plaintiff "need not engage in the 'futile gesture' of traveling to each" allegedly inaccessible hotel so long as she asserts her intent to visit); see also *Steger*, 228 F.3d at 892 ("[P]laintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying" if they would "visit the building in the imminent future but for those barriers."). The challenged discrimination—the presence of the stairs alone without an alternative option for entering—would directly deter an individual from taking a step that would be certain to result in a particularized injury necessary to establish Article III standing.

But Patrick's case is different. It is too attenuated to con-
clude that the mere act of downloading Uber's app and open-
ing an account—without more—would subject her to harm
from discrimination. A claim of unequal access to WAVs does
not follow automatically from downloading the app alone.
Patrick needed to go the next step of alleging particular facts
and circumstances illustrating how she would personally ex-
perience unequal access if she ordered a WAV. Unlike seeing
a picture of an office building with no accessible entrance, see-
ing screenshots of others' experiences with Uber at specific
moments in time does not in any way communicate the same
inevitability of what Patrick would experience if she were to
download the app. Those allegations—the factual predicates
of the injury-in-fact's particularity requirement—will depend
on the application of commercial variables to Patrick's indi-
vidualized needs and circumstances, including where Patrick
lives, what time of day she orders a WAV, where she wishes
to travel to, and the like.

Patrick's amended complaint contains no such personal-
ized allegations, and we decline for purposes of assessing her
standing to hold that downloading Uber's app presents
enough of a threat of discrimination to exempt her from stat-
ing her claim in the individualized terms demanded by Arti-
cle III. Our conclusion is limited to Patrick's standing. We of-
fer no view whatsoever on any arbitration provision that may
(or may not be) in Uber's customer services agreement.

## C

Though we have concluded that Patrick may proceed not
because of her own injury, remember that she also sued based
on her relationship to her husband, who always requires a
WAV. Patrick alleges that she would like to use Uber to travel

with her husband to go to dinner and for other personal pur-
poses.

These allegations fail to establish Article III standing for
the same reasons. Patrick's husband has also never down-
loaded Uber's app, attempted to request a ride, or learned
about the response times he would personally experience.
Any injury to Patrick based on her relationship with her hus-
band—and her understandable desire to travel together with
him for personal reasons—is therefore even more attenuated
and less individualized. Her allegations from this direction
are insufficient to establish the injury necessary to invoke fed-
eral subject matter jurisdiction.

## IV

We close with a brief word in response to the plaintiffs'
contention that the district court should have permitted them
to amend their complaint to expand their claim beyond the
City of Chicago to include the surrounding suburbs. The dis-
trict court concluded that the proposed expansion of the case
came too late in the litigation and would result in unfair prej-
udice to Uber.

Our review is limited to whether the district court's ruling
constituted an abuse of discretion. See *Dubicz v. Common-
wealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004). A court
abuses its discretion if its conclusions "cannot be rationally
supported by the record." *Taubenfeld v. AON Corp.*, 415 F.3d
597, 600 (7th Cir. 2005). We "will overturn a district court's
denial of a motion to amend only if the district court has
abused [its] discretion by not providing a justifying reason for
its decision." *Perrian v. O'Grady*, 958 F.2d 192, 194 (7th Cir.
1992). Undue prejudice from delay can occur, even at the

pleading stage, if the parties have "already invested significant resources in the case." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 687 (7th Cir. 2014).

We see no abuse of discretion in the district court's rejecting Access Living's attempt to expand the geographic scope of the case to include the Chicago suburbs at this late stage. The proposed expansion is massive in a case like this. While the city of Chicago is home to fewer than three million people, the metropolitan area encompasses as many as ten million. These suburban communities all have different demographics in terms of how many residents have disabilities and need WAVs, how frequently they request an Uber, and any number of other factors.

Recall the timing. These proposed amendments came at the eleventh hour—after more than two years of discovery, and shortly before it would close. The circumstances had not changed—the plaintiffs could have just as easily alleged a wider geographic scope earlier—indeed at the very outset of the litigation. In these circumstances, we cannot say the district court's assessment that this amendment would be "significant" and "unduly prejudice Uber" constituted an abuse of discretion.

*             *             *

We therefore AFFIRM the district court's order denying the plaintiffs leave to amend their complaint.